## THE SARAH E. KENNEDY.[1]

### McCARTHY and others *v*. THE SARAH E. KENNEDY.

*(District Court, D. New Jersey.* November 10, 1886.)

1. SEAMEN—WHO ARE—WAGES—LIEN—LABORERS CLAIMING AS MARINERS.
   While there exists an undoubted tendency to extend to all persons, when necessarily and properly employed as co-laborers on a vessel for the purposes of the voyage, the privilege of mariners, and while, subject to this qualification, the rule is independent of sex, character, or profession, it would be inequitable and unjust to extend the rule, by implication, to laboring men hired by the freighter, and not by the vessel, whose contract was solely with the former, and to whom the latter was a stranger, and whose only material connection with the vessel was that they were transported in her as passengers to the port of destination for the purpose of excavating cargo. The circumstance of their having, during the passage, of their own motion, rendered occasionally slight and immaterial assistance in working ship, cannot be used as a pretext when from the evidence it appears that the vessel was provided with a full complement of officers and men.

2. SAME—PLEADINGS AND PROOFS—VARIANCE.
   While, from the evidence, it is possible that the libelants might, perhaps, have had a claim as salvors or lighter-men, it is unnecessary, under the pleadings, to consider the question. The libelants, having claimed as mariners, must recover, if at all, in that capacity.

In Admiralty. Libel *in rem* by laborers claiming a lien upon the vessel for the payment of their wages.

*John Griffin, Jr.*, for libelants.

*Owen & Gray*, for claimants.

WALES, J. The libelants, 13 in number, sue for seaman's wages, and their libels have been consolidated. Their services are alleged to have been rendered on board the brig Sarah E. Kennedy. The brig belonged to Somers Point, New Jersey; and while lying at the port of Baltimore, on the seventeenth of July, 1885, was chartered by Daniel Walters, her master and agent for owners, to Charles Smedley for a voyage from the last-named port to Arenas Key, a small island in the Gulf of Mexico, and back to Hampton roads for orders not east of New York. By the terms of the charter-party, Smedley stipulated to provide and furnish to the vessel a full and complete cargo, under deck, of guano in bulk for the homeward voyage, to carry out men and materials, to gather cargo, and bring men back, to furnish a steward, provisions, take entire care of the men, and to load materials, etc., free of expense to the vessel. He was to pay the master or agent, for the use of the vessel during the voyage, at the rate of four dollars per gross ton for each ton delivered, and deliver the guano along-side at Arenas Key at his own expense. Twenty-five days were allowed for loading and discharge; and for each day's detention by default of the charterer, he was to pay $48. Performance of the con-

[1] Reported by Theodore M. Etting, Esq., of the Philadelphia bar.

tract by Smedley was guarantied by third parties. The brig had her own master, and a full complement of officers and crew, with an ample supply of provisions for their separate use. The libelants, each for himself, by written agreement, engaged to go with Smedley to the island "for a cargo," in consideration of wages varying from fifteen to twenty dollars per month, and found, "and to be under orders, and work diligently as he may direct." The brig was to sail on the twenty-first of July, but did not get off until the twenty-seventh. Smedley accompanied the men.

Nothing unusual occurred on the outward voyage until the island was sighted, on the twentieth of August, at about 7 p. m., when the brig ran on a coral reef or bar, and all hands on board, including libelants, went to work throwing over ballast. The tide was low, but rising, and, after 15 or 20 tons or more had been thrown over, and the top-sails backed, the vessel floated, in about an hour after she had struck, and without damage. The weather was calm. The brig put to sea, and the next day came to anchor off the island. On the 22d, the master notified Smedley that he was ready to discharge supplies and receive cargo. Sunday intervening, the libelants did not get to work until the 24th. They were quartered on the island during the time of loading the vessel, digging out and carrying the guano alongside in scows, from which it would be hoisted on board by the crew. The libelants continued at this work until the fifteenth of September, when, in consequence of a rumor that the water on the brig was falling short, they refused to work any longer, but were prevailed on by the united efforts of Smedley and the master to bring off two more loads in order to trim the vessel; and on the evening of that day the brig sailed on her return voyage, touching at Hampton roads for orders, and arrived off Jersey City on October 15th. The libels were filed four days afterwards.

The libelants were landsmen. Only two of them had been at sea before,—one as a fireman, and the other as a passenger or cook. On the voyage out and back, Smedley, with some of his men, would occasionally assist at the windlass, and at the braces when the vessel was tacking, but they never went aloft, stood watch, or steered. At the time of signing the charter party, Smedley agreed to let the master have the use of the men when he wanted it, but the master says he never called on him for assistance. He had seen Smedley and his men take hold of the windlass and help heave; had seen them catch hold of the braces, and help pull round sometimes; but that most of the men never did anything at all. McCarthy, one of the libelants, says that he helped any time "he was asked,—not every day, but when he was up out of the hold."

The cargo was sold for $3,300. The master's claims for freight, demurrage, etc., exceeded this sum, and he and Smedley had some kind of a settlement in the office of Lister Bros., the purchasers of the guano, in New York. Smedley received $400, with the under-

standing, on his part, that out of the balance the master would pay his own claims, and the wages of the libelants. The master denies that he made any such promise. He and Smedley flatly contradict each other, and the only reliable testimony on this subject is that of Mr. Post, a lawyer, who was present at the time the $400 were paid to Smedley. This witness says that the master's claim was in excess of the value of the cargo, and that, "in making up the statement upon which the settlement was effected, it was stated that this libel had been put upon the vessel. It was part of the settlement that the captain should take care of the claim of these libelants, either by resisting and defeating it in the court, or by satisfying it if a judgment should be obtained." The defense is that the libelants did not sign shipping articles as seamen, and did not in fact render any services as such; that they were not employed by the vessel as laborers, but contracted to work on the credit of Smedley, and not on that of the brig or cargo; and that the slight and occasional help contributed by them in working the ship was entirely voluntary, and not of such character and importance as to give them a maritime lien.

It is contended for the libelants that they are entitled to payment for services rendered, as seamen, or as salvors, or as stevedores. But this contention is founded on the evidence, and not on the allegations contained in the libels, which omit any mention of claims for salvage or for loading the brig. The libelants must recover, if at all, as seamen, *secundum allegata et probata*. *The Boston*, 1 Sum. 331, where it was held not sufficient that there are facts proved which might have a material bearing, unless there are allegations suited to bring them, as matters of plea and controversy, before the court. See, also, Admiralty Rule 23, and Ben. Adm. § 401. The only question, then, is, can these libelants recover, under the head of seamen or mariners, on the law and the facts of the case. The solution of this question will govern the decree of the court.

The main proposition in support of the affirmative is that "all the persons who have been necessarily or properly employed in a vessel as co-laborers for the great purpose of the voyage, have by the law been clothed with the legal rights of mariners,—no matter what might be their sex, character, station, or profession." Ben. Adm. § 241. And the cases chiefly relied on to sustain and illustrate this rule are *The Ocean Spray*, 4 Sawy. 105; *The Highlander*, 1 Spr. 510; *The Canton*, Id. 437; *The Minna*, 11 Fed. Rep. 759.

In *The Ocean Spray*, 30 Indians were shipped by the vessel, at Victoria, to go to the northern waters to take seal, "and to lend a hand on board whenever they were wanted," for $30 per month, until they returned to Victoria, where they were to be paid off and discharged. During the outward voyage, when head winds prevailed, they helped to reef and make sail, heave the anchor and clear decks, but did not stand watch. They were also employed in procuring

drift-wood and water for the use of the vessel, and were under the control of her officers. Judge DEADY, in an able opinion, decided that, even if the libelants shipped and served as sealers only, they ought to be deemed mariners, as they were certainly co-laborers in the only purpose of the voyage,—the taking of fur seal,—and that the sailors on the schooner only contributed to this purpose by navigating her.

The *Minna* was a tug employed in fishing; her crew consisting of a master and engineer. The libelant took no part in navigating the vessel, but was employed solely as a fisherman. His contract required him to go out every day, to set and lift the nets, clean the fish, discharging the catch, and reeling the nets on shore. He also lodged on shore at night. It was there held, following the rule in *The Ocean Spray*, and in Ben. Adm. § 241, that all hands employed upon a vessel, except the master, are entitled to a lien if their services are in furtherance of the main object of the enterprise in which she is engaged.

In *The Highlander*, the services of divers and wreckers on board of a sea-going vessel were held to be maritime, and therefore a lien. In that case the libelants were all regularly shipped by the vessel, and some of them were expressly required to take part in her general management.

*The Canton* presents the case of persons employed to load, navigate, and unload a vessel plying principally between Quincy and Boston, for the transportation of stone, in which it was decided that when the contract of service is for the navigation of tide-waters, and laying stone in wharves is merely incidental and subsidiary to the principal business, the whole service may be maritime.

These decisions are not open to criticism under the particular facts on which they were made, and the general principles declared in them may be fully approved; but they are distinguishable from the case at bar in two important elements, if not more. In the cases cited, the libelants were employed by and upon the vessel; their services were directly given to the vessel; and, in *The Ocean Spray*, the vessel was expressly bound for the wages. In the present instance the men were not shipped by or engaged to work on the brig. Their contract was with Smedley, and was made independently of the vessel. They were at no time under the control of her officers, and it is not pretended that whatever service they may have performed on the vessel was given in obedience to orders, or otherwise than voluntarily. They were neither skilled as seamen, wreckers or divers, stevedores or fishermen. They were common laborers, and contracted to go out to the island as such, with the exception of one or two, whom Smedley had hired, as rough carpenters, to build the scows. They went out and returned as passengers. The work done by them was for Smedley, and on his credit, and not for the brig, or on her credit, or on that of the cargo; and it would be extending the

doctrine of co-laborers too far to include their services under that head.

There is no evidence of any imposition on the libelants by the master or officers of the brig, in taking advantage of their ignorance, and endeavoring to use their labor without compensation. If they had been inveigled on board as passengers, or on the pretense of being carried out as landsmen to work on shore for a third party, and had been compelled to do duty on the vessel, they would have a just and legal claim on the owners. But there is no evidence that any fraud or deceit was practiced on them. Their labor was all on shore, and not on the vessel. Smedley was not even the owner *pro hac vice*. His contract was one of affreightment, though styled a charter-party. They gave credit to him personally, and were not deceived by the master or agent of the owners; and, though their situation may be a hard one, entitling them to sympathy, a maritime lien, being *stricti juris*, cannot be intended by implication or construction for their benefit.

The *Ole Oleson*, 20 Fed. Rep. 384, has a suggestive resemblance to the present case. There, the intervenors sought to obtain a share of the proceeds arising from the sale of the vessel, on the ground that they had rendered maritime services. They had been employed as stone pickers by the master, who was also managing owner, to gather stone on the shore of Lake Michigan, at or near Alpena, and to assist in loading the stone on board as cargo to be carried to Chicago. While engaged in this service, they lived and slept on the vessel as she lay off shore; and when the weather was such that stone could not be gathered, the schooner would run into Alpena, and the intervenors would then lend a hand in hoisting sail. But they did not accompany the vessel on her voyages, and were not employed as seamen, the vessel having a full crew without them. It was not insisted that the men were seamen, but that their services were of a maritime nature, and entitled to a lien. Judge DYER, while giving his approval to *The Canton*, *The Ocean Spray*, and *The Minna*, says the intervenors were mere landsmen, procuring cargoes on shore, and assisting in loading them. In a general sense, their services were in furtherance of the vessel's employment, but not more so than the services of stevedores, who, as he understood the authorities, were not entitled to a lien, though as an original question he thought otherwise.

Conceding, however, that under recent decisions a stevedore is entitled to a lien, the libelants in the present case did not act as stevedores. Their work ended along-side of the vessel. The guano was hoisted on board, and stowed by the crew. They might, perhaps, have had a claim as lighter-men had they been employed by the brig in that capacity, (Ben. Adm. 284;) but being restricted, as we have already said, to the allegations of the libels, we find nothing in them to warrant a decree for that service. Their claim is that they hired on board the brig as seamen on the credit of the vessel and cargo, as

well as the owners and charterer, and that, during the whole of the voyage they were obedient to the lawful commands of the master and Smedley. The evidence does not bear out this claim; and, under the pleadings and on the facts proven, the brig is exempt from liability.

This conclusion makes it unnecessary to consider the claims for damages for a shortage of provisions and general bad treatment during the voyage, because the owners were not responsible to the libelants on account of those charges, even were they true. Neither can the owners be held responsible for the alleged undertaking of the captain to pay the libelants out of the proceeds of the sale of the cargo. The latter undertaking, had it been made, being without the scope of the captain's authority, could not bind the owners. *The Norman*, 28 Fed. Rep. 383.

The libels must be dismissed.