## SHERIFFS VS. PUGH.

*Charter-party construed—Whether owner or charterers liable for seamen's wages.*

1. If the charterer of a vessel has the entire control of it, so that the captain and seamen are primarily in his employ, and he runs it at his own expense, the general owner is relieved from liability for seamen's wages; otherwise not.
2. A waiver by the general owner of his lien for the freight (as by the taking the charterer's notes therefor), does not of itself relieve him from liability for seamen's wages.
3. A vessel was chartered from the owner and captain for a season for $11,250, the charterers to give their notes for $5,000, and "pay the vessel's running expenses, or a sum not exceeding $800 per month for the same while running," to be retained by the captain out of the freights, and the balance at the end of the season; and if her gross earnings exceeded $11,250, one-third of the excess was to be paid the owner and captain.   The latter were to "place the vessel at the disposal" of the charterers during the season, and the captain was to "sail her himself," attend to the collection of freights, etc.   *Held*, that the phrase "to sail her himself" must here be construed to mean, that the

captain, as agent for the owner, was to employ the crew; and the owner is liable for the seamen's wages.

APPEAL from the County Court of *Milwaukee* County.

*Sheriffs* brought an action against one Wolcott to recover $154.76, and garnisheed Pugh; and the answer not being satisfactory, and judgment having been recovered against Wolcott, an issue was made up between the parties in said court.   *Pugh* was owner, and Wolcott mate, of a schooner during the season of navigation on Lake Michigan and the connecting lakes, in 1864; and the schooner was chartered for the season by Messrs. Pridham & Davison.   The question was, whether the owner or the charterers were liable for Wolcott's wages. . The charter-party was as follows: "[Date.]   We, the undersigned Edwin Pridham and J. H. Davidson, agree to charter the schooner W. J. Whaling from *Richard Pugh, Esq.*, and Captain James D. McGaw, for the season of navigation 1864, on the following conditions, viz.:   For the sum of $11,250, for which we give our notes as follows: [here follows a specification of four notes for an aggregate of $5,000, payable between May 1st and October 10th, 1864]; also to pay the vessel's running expenses, or a sum not exceeding $800 per month for the same while running, and the balance when the vessel is laid up in the fall.   The freights collected by said vessel on her return each trip to Milwaukee, to be handed us—less the above amount of $800, retained by Captain McGaw for expenses.   In addition to the above $11,250, if her gross earnings exceed that amount, one-third of the said balance over and above the $11,250 to be paid said *Richard Pugh* and Captain McGaw at the close of the season.   We also agree, in case the vessel goes through the Welland Canal, to pay the tolls on her cargoes each trip.   In connection with the above, the said *Richard Pugh* and Captain J. D. McGaw place the schooner W. J. Whaling at our disposal during the term of

navigation. Captain McGaw to sail her himself, attend to collection of freights, etc., etc. Should the vessel, any time during the season, be laid up by accident, we are to be allowed for her detention by such accident for the length of time she is delayed in proportion to the amount paid for the time intervening betwixt the date of her first sailing and laying up; and should she at any time be lost, or so injured as to prevent her running again during the season of 1864, the charter to cease from that time, and a settlement made in accordance with the above. All the parties connected with the above promise to use their utmost endeavors to promote the interests of said vessel. EDWIN PRIDHAM, J. H. DAVIDSON."—" We, the undersigned Richard Pugh and J. D. McGaw, second party to the above agreement, approve and accept of same in all its conditions and provisions, and agree to perform our part of the same as therein specified. RICHARD PUGH, JAMES D. McGAW." Judgment of nonsuit; from which the plaintiff appealed.

Stark & McMullen, for appellant, cited Palmer v. Gracie, 4 Wash. C. C., 110, and 8 Wheat., 605 [pp. 632–33]; Hooe v. Groverman, 1 Cranch, 214; Marcardier v. Chesapeake Ins. Co., 8 Cranch, 39; McIntyre v. Bowne, 1 Johns., 229; The Schooner Volunteer, 1 Sum., 551; Fletcher v. Braddick, 5 Bos. & Pul., 182; Fenton v. Dublin Steam Packet Co., cited in Abb. on Ship., 64, (*56), and 1 Parsons Mar. Law, 234, n. 2; Emery v. Hersey, 4 Greenl., 407; The Ship Nathaniel Hooper, 3 Sum., 567; Clarkson v. Edes, 4 Cow., 478.

Palmer & Hooker, contra, cited Flanders on Shipping (Phil. Ed. of 1853), p. 347, sec. 354; 3 Kent, 136; Reave v. Davis, 1 Ad. & El., 95; Skölfield v. Potter, Daveis, 392; Abb. on Ship., 47, and note T. and cases there cited; McIntyre v. Bowne, 1 Johns., 229; Parsons' Merc. Law, 357–59, and note 2.

PAINE, J.   The defendant, being the owner of a vessel, was garnisheed by the plaintiff as indebted to one of the seamen.   It appeared on the trial, that the ship had been chartered for the season when the alleged indebtedness accrued; and it was claimed, and held by the court below, that the effect of the charter-party was to relieve the owner from liability, and substitute the charterers in his stead.

The law applicable to the question seems to be well settled.   It is, that if the person chartering the vessel has the entire control of it, so that the captain and seamen are primarily in his employ, and he runs it at his own expense, then he is regarded as the owner for the time being, and the general owner is relieved from liability.   But if, notwithstanding the charter-party, the general owner retains the possession of the vessel so far as to run it by his own captain and seamen, the latter will be in his employ, and he will be liable.   *The Schooner Volunteer*, 1 Sumner, 551; *The Ship Nathaniel Hooper*, 3 id., 542; *Emery v. Hersey*, 4 Greenl., 407; *Clarkson v. Edes*, 4 Cow., 470; *Kenzel v. Kirk*, 32.How. Pr., 269.

It will be observed that the question here is not whether, under the terms of this charter-party, the general owner retained a lien for the freight.   The lien may be waived, although the owner retains possession of and runs the vessel.   And taking notes for the hire of the vessel, as was done here, such notes being payable at stated times during the season, would probably be held to constitute such waiver.   *Chandler v. Belden*, 18 Johns., 162.

But the question here is, who, under this charter-party, must be held to have employed the seamen?   It is a question not free from difficulty.   There are clauses in the instrument, which, taken alone, would seem to indicate that entire renunciation of possession by the owner which relieves him from liability.   But, notwithstanding these, we

have come to the conclusion, upon a careful consideration of all its provisions, that such was not its effect, but that the owner was to employ and be primarily liable to the seamen.

The clauses above referred to are, the one which provided that the vessel was to be placed at the disposal of the charterers, and the one relating to their paying the running expenses. The former clause, however, is not inconsistent with the theory that the owner was to keep his own captain and men in possession of the vessel, to navigate it. He might man her, and place her at their disposal already manned, or he might place her at their disposal, and leave them to man and run her. The provision is equally appropriate in either case. As to the other clause, although it might seem at first glance to provide that the charterers were to be at the expense of running the vessel, yet upon closer examination it will be found that there is no such undertaking on their part, and that the clause does nothing more than provide a mode by which they are to pay a part of the gross sum which they undertook to pay for the whole hire.

As the instrument contains no express provision as to who was to hire and pay the seamen, it became necessary to see if there is any thing fairly implied on the subject. And here it seems very important to determine the relation which the captain held to the owner, and to the charterers in this contract. Was he the agent of the latter, or of the former? It seems manifest that he was the agent of the owner, and that he became a party to the contract as such. He and the owner are the second party to the contract, and the charterers the first. The owner and the captain agreed to place the schooner at the disposal of the charterers. After the charterers had signed it, they then signed the following provision: " We, the undersigned, Richard Pugh

and J. D. McGaw, second party to the above agreement, approve and accept of the same in all its conditions and provisions, and agree to perform *our* part of the same as therein specified." These provisions leave no doubt that the captain became a party to this contract as the agent of the owner. And this being established, then the provision that " Captain McGaw should sail her himself," becomes equivalent to a provision that the owner, by his own captain and men, was to retain possession of and navigate the vessel. For, it being usual for captains to employ the seamen, and there being no express provision on the subject, the phrase " to sail her himself " should undoubtedly be construed, not only that he was to command her, but to employ the crew necessary for her navigation. In employing them he was therefore the agent of the owner, and the owner was liable to the seamen for their wages.

The clause requiring the charterers to pay a sum not exceeding $800 per month for running expenses, was a mode of reimbursing the owner for his primary liability in this respect, and does not alter the relation between the owner and the seamen. They first agree to pay the sum of $11,250 for the hire of the vessel for the season. They then provide that they were to give their notes for sums amounting in all to $5,000, payable at stated times during the season. Then there is the clause : " also to pay the vessel's running expenses, or a sum not exceeding $800 per month for same, while running, and the balance when the vessel is laid up in the fall." The " balance " here referred to is evidently the balance of the $11,250, after deducting the notes and the $800 per month for running expenses. But when they had paid that sum, their liability ceased. They took no risks beyond that. If the expense of running the vessel had been much more than $800 per month, the owner not only was liable for it, but the charterers were

not bound to reimburse him. If the vessel had earned $25,000, and it had cost $20,000 to run her, the charterers would have been entitled to two-thirds the excess over the $11,250, without regard to the expense. The contract seems to be, in substance, nothing more than a guaranty that the vessel should earn $11,250, in consideration of the right to two-thirds of what it should earn over that sum.

We are of the opinion, therefore, that under this charter-party, the captain and crew were in the employ of the owner, and that he was liable to the seamen. If there was an indebtedness for services to the seaman Wolcott, the defendant should have been held chargeable for the amount.

*By the Court.*—The judgment is reversed, and the cause remanded for a new trial.