## LEARY *v.* UNITED STATES.

1. If by the terms of a charter-party the entire vessel is let to the charterer with a transfer to him of its command and possession and consequent control over its navigation, he will generally be considered as owner for the voyage or service stipulated. But if the charter-party let only the use of the vessel, the owner at the same time retaining its command and possession, and control over its navigation, the charterer is regarded as a mere contractor for a designated service, and the duties and responsibilities of the owner are not changed. In the first case the charter-party is a contract for the lease of the vessel; in the other it is a contract for a special service to be rendered by the owner of the vessel.

2. Stipulations in a charter-party that the general owners shall keep the vessel in good condition during the existence of the charter, and receive on board certain goods at the request of the government (the charterer) and refuse to receive other goods without its assent. *Held*, to be conclusive evidence that the possession and control of the vessel had not passed to the charterer but had been retained by the general owner.

3. In a charter-party by which a vessel was hired by the government for the purpose of plying in the harbor of Port Royal, in South Carolina, or for such other service as the government might designate, it was stipulated that in case the vessel, while executing the orders of the government, should be destroyed or damaged, or by being compelled by the government to run any *extraordinary marine risk*, the owner should be indemnified. In complying with the orders of the harbor master in Port Royal the vessel struck upon the fluke of a sunken anchor in the harbor, and was sunk; *held*, that the risk which the vessel thus incurred was not an extraordinary marine risk within the meaning of the charter-party, but an ordinary risk which every vessel runs that enters a harbor, and which every marine policy covers.

APPEAL from the Court of Claims.

On the 19th of November, 1862, one Leary, owner of the steamer Mattano, chartered her to the United States, for the purpose of plying in the harbor of Port Royal, South Carolina, or for any other service the government might designate.

By the terms of the charter-party Leary engaged that the vessel during the existence of the charter, should be kept tight, stanch, well-fitted, tackled, and provided with every requisite, and with men and provisions necessary; that the whole of it (with the exception of room necessary for the accommodation of the crew and the storage of cables and provisions) should be at the sole use and disposal of the

government during the existence of the charter; and that no goods or merchandise should be laden on board otherwise than from the government or its agent, on pain of forfeiture of the amount that may become due on the charter; that he, Leary, would receive on board the vessel, during the charter, all such goods and merchandise as the government might think proper to ship. The government on its part agreed to charter and hire the vessel at $250 a day, for each day that it might be retained under the charter, the government to supply the coal; and that in case the vessel, while executing the orders of the government, should be destroyed or damaged by a hostile force from any quarter, or by being compelled by the government *to run any extraordinary marine risk,* then Leary was to be indemnified; in case of loss, the value of the vessel being fixed at $26,000, "and in case of damage, the amount to be assessed *by a board of survey,* to be convened on her, after her arrival at Port Royal, South Carolina, or other friendly port, at the expense of the government."

While under charter, the vessel was lying at one of the wharves in the harbor of Port Royal. On the 12th of May, 1863, the military harbor-master ordered her out to make room for another steamer. The captain of the Mattano objected to going out, as the tide was very low; and, as he believed, there was a considerable breeze from an unfavorable quarter. The harbor-master ordered the Mattano peremptorily to back out, and her captain let go his lines and did so. In thus backing out she struck upon the fluke of a sunken anchor imbedded in the sand, and sunk in fifteen minutes.

This anchor, against whose fluke the vessel struck, was a mooring anchor, and had been placed where it was by the United States quartermaster, to moor big ocean steamers prior to November, 1862, and had a buoy attached to it which showed its position; but, about the 1st of January, 1863, the buoy had gone adrift in a gale of wind, and had never been replaced, and there was nothing at the time of the accident to warn vessels of the position of the sunken

anchor. No one could have pointed out where the anchor was at that time. The captain of the Mattano knew of the existence of the anchor, but thought he was a long way outside of it. There was no unskilfulness in executing the order to back out.

The Mattano was removed from where she sank by a wrecking-boat sent there by the Secretary of War, and under orders from the quartermaster, about July 4th, 1863, and the cost of this service was paid by the United States. A gale of wind, which came on after she sank, did damage to her by carrying off her upper works, wheel-house, and joiners' work clear to the hull. No board of survey was convened to assess the damage done to the vessel.

After the vessel had been raised by the United States Leary took possession of her, carried her to New York, and there had her put in order in such a way as to leave her fit for a towing or carrying vessel, but not fitted for passengers. These repairs were completed on the 10th of December, 1863, and cost Leary for her restoration $18,265.25; and she was worth then $12,000 less than before the accident. From the time this occurred, 12th of May, 1863, until the time the repairs were completed, December 10th, 1863, there were two hundred and fourteen days. The repairs were made as rapidly and as economically as possible. She was chartered again to the defendants in May, 1864, at $100 a day.

On this case the Court of Claims decided that the disaster was a usual marine disaster, such as was covered by ordinary marine policies of insurance, and not such extraordinary marine risk as was contemplated in the charter-party; and that if the owners neglected to protect themselves against such perils by insurance they would have to bear the loss. The court accordingly dismissed the petition, and hence the appeal to this court.

*Messrs. Chipman, Hosmer, and Durant, for the appellants, argued in substance:*

1st. That the United States were the owners of the injured

vessel, by the terms of the charter-party, during the continuance of the service stipulated, and were consequently responsible for the damages sustained by the vessel whilst engaged in that service.

2d. That the damages to the vessel were occasioned by her running an extraordinary marine risk under compulsion from the United States, and for indemnity against such damages the charter-party stipulated, and they sought a reversal of the decree accordingly on those grounds.

*Mr. G. H. Williams, Attorney-General,* and *Mr. C. H. Hill, Assistant Attorney-General, contra.*

Mr. Justice FIELD delivered the opinion of the court.

There is no doubt that under some forms of a charter-party the charterer becomes the owner of the vessel chartered for the voyage or service stipulated, and consequently becomes subject to the duties and responsibilities of ownership. Whether in any particular case such result follows must depend upon the terms of the charter-party considered in connection with the nature of the service rendered. The question as to the character in which the charterer is to be treated is, in all cases, one of construction. If the charter-party let the entire vessel to the charterer with a transfer to him of its command and possession and consequent control over its navigation, he will generally be considered as owner for the voyage or service stipulated. But, on the other hand, if the charter-party let only the use of the vessel, the owner at the same time retaining its command and possession, and control over its navigation, the charterer is regarded as a mere contractor for a designated service, and the duties and responsibilities of the owner are not changed. In the first case the charter-party is a contract for the lease of the vessel; in the other it is a contract for a special service to be rendered by the owner of the vessel.

In examining the adjudged cases on this subject we find some differences of opinion, especially in the earlier cases, as to the effect to be given to certain technical terms used

in the charter-party in determining whether the instrument
parts with the entire possession and control of the vessel,
but no difference as to the rule of law applicable when the
construction is settled.   All the cases agree that entire com-
mand and possession of the vessel, and consequent control
over its navigation, must be surrendered to the charterer
before he can be held as special owner for the voyage or
other service mentioned.   The retention by the general
owner of such command, possession, and control is incom-
patible with the existence at the same time of such special
ownership in the charterer.*

If, now, in the light of these observations we look at the
charter-party in this case we shall find little difficulty in dis-
posing of the first ground for reversal presented by the ap-
pellants.   The vessel here was chartered for the purpose of
plying in the harbor of Port Royal, in South Carolina, or
for such other service as the government might designate,
and the provisions which the charter-party contains on the
part of the owners sound only in covenant.   By it they
engage that during the existence of the charter the vessel
shall be kept tight, stanch, well fitted, tackled, and provided
with every requisite, and with the necessary men and pro-
visions; that the whole of the vessel, with the exception of
the necessary room for the accommodation of the crew and
the storage for the cables and provisions, shall be at the sole
use and disposal of the government; that no goods or mer-
chandise shall be laden on board otherwise than from the
government, or with the assent of its agent, on pain of for-
feiture of the amount that may become due on the charter;
and that the owners will receive on board all lawful goods
and merchandise which the government may think proper
to ship.   In consideration of these stipulations the United
States agree that the owners shall receive the sum of two

---

* Christie *v.* Lewis, 2 Brod. & Bing. 410, 434; Marcardier *v.* The Chesa-
peake Insurance Company, 8 Cranch, 39, 49; The Schooner Volunteer and
Cargo, 1 Sumner, 551, 556; Drinkwater *v.* Freight and Cargo of Brig Spar-
tan, Ware, 149, 154; Donahoe *v.* Kettell, 1 Clifford, 135; Holt on Shipping
461-471.

hundred and fifty dollars per day for each day the vessel is retained, under the charter, and that they will supply the vessel with coal; and in case the vessel, whilst executing the orders of the government, shall be destroyed or damaged by a hostile force, or by being compelled to run any extraordinary marine risk, that the owners shall be indemnified.

The stipulations here designated on the part of the owners imply the possession and command of the vessel by them, and would be inconsistent with such possession and command by the government.

Stipulations that the general owners shall keep the vessel in good condition during the existence of the charter and receive on board certain goods at the request of the government and refuse to receive other goods without its assent, would be out of place and inappropriate if the government were, at the same time, special owners of the vessel for the service stipulated, having the vessel in its entire possession and control. Great weight was given to similar clauses by the King's Bench, in *Saville* v. *Campion*,\* and by the Supreme Court of New York, in *Clarkson* v. *Edes*.† In each of these cases they were held conclusive that the possession and control of the vessel had not passed to the charterer, but had been retained by the general owner.

The fact that the service stipulated in the present case was to be rendered for the government cannot alter the natural import of the terms used in the charter-party, or change its construction, although in a doubtful case that fact might be entitled to much consideration.

2. The second ground presented by the appellants for a reversal of the decree is readily answered. The risk that the vessel incurred in complying with the orders of the harbor-master was not an extraordinary marine risk within the meaning of the charter-party. The term extraordinary is there used to distinguish an unusual risk which the vessel might be compelled to run by order of the government, from those risks which would be covered by an ordinary

---

\* 2 Barnewall & Alderson, 511.                    † 4 Cowen, 477.

marine policy and which might be expected to arise from the service in which the vessel was engaged. The contract of the government was not intended to apply to the usual risks attendant upon the performance of a service such as was here mentioned, but risks outside and beyond them.

The risk incurred was of a possible collision with a sunken anchor in the harbor. This was an ordinary risk which every vessel must run that enters a harbor, and is one which every marine policy covers.

DECREE AFFIRMED.