## The Ole Oleson.

( *(District Court, E. D. Wisconsin.  May 12, 1884.)*

1. LIBEL—INTERVENORS—SEAMEN'S WAGES—MARITIME SERVICE.
     Where intervenors are mere landsmen, who procure cargoes for a vessel and assist in loading them, they do not perform a maritime service, and are not entitled to recover upon a libel for seamen's wages.
2. MARITIME LIEN—PURCHASE OF CARGO BY MASTER OF VESSEL.
     The master and part owner of a vessel cannot purchase a cargo on credit and thereby create a maritime lien upon the vessel for the purchase money.
.3. SHIP'S HUSBAND—DUTIES AND POWERS.
     The duties of a ship's husband are to provide for the seaworthiness of the ship, to take care of her in port, to see that she has on board necessary and proper papers, to make contracts for freight, and to collect the returns therefor; but he cannot borrow money, give a lien on the freight, make insurance, or purchase a cargo, without special authority.

In Admiralty.

*Markham & Noyes,* for intervenors.

*J. E. Wildish,* for mortgagee.

DYER, J.   Objections are filed to claims made by Bernard Kienast and August Walkowski to a share of the proceeds arising from the sale of the schooner Ole Oleson upon a libel for seamen's wages. The intervenors were employed as stone-pickers by the master of the vessel, who was also managing owner, to gather stone on the shore of Lake Michigan at or near Alpena, and to assist in loading the stone on board as cargo to be carried to Chicago.   While engaged in this service they lived and slept on the vessel as she laid off shore; and the master testifies that when the weather was such that stone could not be gathered, the schooner would run into Alpena, and the intervenors would then lend a hand in hoisting sail.   But they did not accompany the vessel on her voyages, and were not employed as seamen, the vessel having a full crew without them.   The only question is, was the service which they rendered in picking up stone for the vessel a maritime service, and I am constrained to hold that it was not.

Three cases are relied on in support of the alleged right of these claimants to payment from the fund in the registry, namely : *The Canton,* 1 Spr. Dec. 437; *The Ocean Spray,* 4 Sawy. 105; and *The Minna,* 11 FED. REP. 759.   These cases are all distinguishable from this.

In the case of *The Canton,* the employment of the libelants was to load the vessel at Quincy with stone, not as quarrymen, but to take the stone on board from a wharf, *to navigate the vessel to Boston,* and there to unload her.   As was said by Judge SPRAGUE, they must have been able to "hand-reef and steer," the ordinary test of seamanship. These duties they performed, and so they were not landsmen merely, but actually participated in the navigation of the vessel.

In the case of *The Ocean Spray*, the vessel went upon a voyage for sea. The libelants shipped as sealers, and were hired to take seal for the vessel at a stipulated sum per month, and their shipping agreement bound them also "to lend a hand on board whenever they were wanted." On the voyage they helped make and reef sail, heave the anchor, and clear decks, but did not stand watch. They also procured drift-wood and water for the use of the vessel. They thus aided in the navigation and preservation of the vessel, and, as Judge DEADY well states the case, they were co-laborers in the leading purpose of the voyage. Upon the principle applicable to surgeons, stewards, cooks, and cabin boys, they were to be considered as mariners. They engaged for the voyage, were employed in promoting the purpose of the voyage, and aided in the navigation of the vessel; and, as Judge DEADY says, without their services the voyage must have been profitless, because the purpose of it could not have been accomplished. Moreover, the vessel was expressly pledged as security for the payment of the wages of the sealers for the round trip.

The case of *The Minna* seems at first sight to rub the case in hand more closely. The Minna was engaged exclusively in fishing. As the case is stated, she ran out from Alpena every morning to the fishing grounds, threw her nets, made a catch of fish, and returned to port, where the fish were discharged and prepared for market. Her crew consisted of a master and engineer. The libelant was employed as a fisherman, and though he took no part in the navigation of the tug, his contract required him to go out with the tug every day, to set and lift the nets, clean the fish, discharging the catch and reeling the nets on shore, where he lodged at night. His services were, therefore, as Judge BROWN decided, in furtherance of the main object of the enterprise in which the vessel was engaged. He assisted in the main purpose of the vessel's employment. His services were mainly performed on board the tug, and were necessarily connected with, and part of, the service in which the tug was engaged. They were, therefore, maritime in their character.

In the case in hand the intervenors were mere landsmen. They procured cargoes on shore for the vessel, and assisted in loading them on board. In a general sense their services were in furtherance of the vessel's employment, but not more so than the services of stevedores, and the present weight of authority is that stevedores have no maritime lien upon a ship for services in loading and stowing her cargo. *Paul* v. *Bark Ilex*, 2 Woods, 229, and cases there cited. The services of the intervenors were completed before the voyages of the vessel were begun. They did not attend her upon her voyages. They were laborers on shore, and the nature of their contract was not affected by the fact that they obtained their meals and at night slept on board the vessel as she laid off shore or harbor. In material respects, the case, I think, differs from that of *The Minna* and the other cases cited, and I shall sustain the objections to these claims on the

ground that the services of the intervenors stand on the same footing as those of stevedores. I thus rule, not without some hesitation, for, as an original question, I must confess I have never been able to see why the employment of a stevedore should not be regarded entitling him to a maritime lien.

Objections are also filed to a claim against the proceeds, in the registry of the court, of $248.30, made by one Robert Peacock, which claim arose upon the following state of facts: The Oleson, being at Bay de Noquette, in Michigan, her master, who was half owner of the vessel, purchased from Peacock a cargo of culled lumber to carry to Racine, Wisconsin, the home port of the vessel. The contract of purchase was in writing, and was as follows:

"BAY DE NOQUETTE, September 3, 1883.

"When schr. Ole Oleson unloads the load of culls, she, by her captain, promises to pay to the order of R. Peacock the sum of two hundred forty-eight 30-100 dollars, being the amount due for the cargo now loaded. This lumber was sold the vessel so she could make a freight. Interest after due until paid.                    SCHR. OLE OLESON, OF RACINE,

"By her Captain, JOHN SCHULTZ."

The cargo was carried to Racine, was there attached and sold, and the demand of the vendor, Peacock, for the purchase price has ever since remained unpaid. The question is, did Peacock acquire a maritime lien on the vessel, for the amount due him for the lumber, which took precedence of a prior mortgage on the vessel? The instrument executed by the master does not, by its terms, purport to create a lien. It is true that in the last clause it is stated that the lumber "was sold the vessel so that she could make a freight;" but it does not, in terms, assume to give the vendor of the lumber a lien. The only question, then, is, does the maritime law give the vendor a lien on the vessel from the mere fact that the master bought the cargo for the purpose of earning freight? Or, to state the proposition in another and more general form, can a master and part owner of a vessel purchase a cargo on credit and thereby create a maritime lien for the purchase money, on the vessel? So far as the power of the master, acting simply in that character, to bind the owners of a vessel in the purchase of cargo, is concerned, adjudged cases seem to have settled the question, beyond controversy, in the negative.

In *Hathorn* v. *Curtis*, 8 Greenl. 360, the court said:

"The master, in his capacity as such, has power to bind the owners of the ship in contracts relative to her usual employment only. This power relates merely to the carriage of goods and the supplies requisite for the ship; but the owners of the ship cannot be bound by any contract of the master concerning the purchase of cargo. To bind the owner in such a contract the master must be clothed with powers other than those which are necessarily incident to his office as commander of the ship. He may, indeed, act in the double character of master and supercargo or consignee, but his power to sell, cases of necessity excepted, or to purchase cargo, flows, not from his official character as master, but from special authority conferred for that purpose."

In *Jewett* v. *Buck*, 17 Me. 153, Judge SHEPLEY held that—

"The master may bind the owners by his contracts relating to the usual employment of the vessel in the carriage of goods, but has no power as such to purchase a cargo on their account. The ship's husband or managing owner may bind the owners for the outfit, care, and employment of the vessel, but has no power to purchase a cargo on the credit of the owners." Citing, in support of the last proposition, *Bell* v. *Humphries*, 2 Starkie, 286.

The rule thus laid down in 8 Greenl. and 17 Me. is also asserted without qualification in *Newhall* v. *Dunlap*, 14 Me. 180, and *Lyman* v. *Redman*, 23 Me. 289.

In *Maylor* v. *Baltzell*, Taney, Dec. 55, Chief Justice TANEY said:

"The master has a right to contract for the employment of the vessel under circumstances of necessity, and the owners will be bound by it; but this right is derived from the Maritime Code, which is founded on the general usage and convenience of trade, and which has been adopted to a certain extent by all commercial nations. The authority of the master is limited to objects connected with the voyage, and if he transcends the prescribed limits, his acts become, in legal contemplation, mere nullities, and it is incumbent on the creditor to prove the actual existence of the necessity of those things which gave rise to his demand."

If, then, the master, acting in his official character of master, has not the power to make a purchase of cargo, and bind the owners of the vessel, it would seem quite logically to follow that he could not, in such a transaction, bind the vessel. This right to make engagements on the credit of the vessel being restricted to cases of necessity, he would seem to have no greater authority to purchase a cargo, and thereby create a lien on the vessel, than by the same act to bind the owners. The rule in the one case has not been more unqualifiedly laid down than in the other. "The master, acting as an agent, is limited and restricted in his power, and can pledge his vessel only in case of necessity for the purpose of repairs, and other things indispensable to the prosecution of the voyage. It is for the convenience of commerce that he should have authority to pledge his vessel for the security of a foreign creditor who might furnish the means of relieving his necessities. But such power ought to be well guarded, and confined to cases coming within the reason of the rule. It is, therefore, incumbent on the creditor to show that the advances were made for repairs and supplies necessary for effectuating the objects of the voyage, or the safety and security of the vessel. The master would, therefore, have no right to pledge the vessel for advances to purchase a cargo." *The Mary*, 1 Paine, 674. And, certainly, if he could not create a lien on the vessel for advances to purchase a cargo, he could not create such lien by a direct purchase of the cargo on credit, in favor of the vendor.

Attempt was made on argument to liken this case by analogy to one of bottomry. But the analogy fails, because some of the well-known essentials of a marine hypothecation of that character are not here shown. Moreover, so far as the power of the master to execute

an instrument of bottomry is concerned, it is limited to the necessities of the ship. If, then, according to the rule laid down in the adjudged cases, it was beyond the power of the master, acting in that capacity alone, to create a lien on the vessel for the purchase price of the cargo, is the rule changed or affected by the fact that the master was part owner of the vessel? It is to be observed that the other part owner was not present and did not participate in the transaction. We have seen that the ship's husband or managing owner has no power, *virtute officii*, to purchase a cargo on the credit of the owners. In the case of *The Mary, supra*, it was held that the owner of the ship, having absolute control over his property, has a right to pledge his vessel for money borrowed for any purpose to be applied to repairs, outfits, or other necessaries, or to the purchase of a cargo. This was held in a case where the owner had executed a bottomry bond for the payment of money advanced for repairs, outfit, and other disbursements for the use of the vessel, and to enable her to perform her voyage. But the duties of the ship's husband are in general to provide for the seaworthiness of the ship, to take care of her in port, to see that she has on board all necessary and proper papers, to make contracts for freight, and collect the freight and all returns. 1 Bell, Comm. (4th Ed.) p. 410, § 428; Id. (5th Ed.) 504. But he cannot borrow money, nor give up the lien for freight, nor insure, nor purchase a cargo for the owners without special authority. 1 Pars. Shipp. & Adm. 110. Part owners are not, by virtue of such ownership, copartners. The general rules of co-tenancy apply, and controlling authority would have to be produced before I could be persuaded to hold that a part owner can by implication bind the vessel for the purchase price of a cargo, thereby displacing other existing liens. It would be a dangerous power to lodge either in the master, or managing or part owner, for in carrying such a cargo the vessel would be simply carrying the property of her owner, and if he chose not to pay for it, the result would be, according to the doctrine here contended for, that prior liens would be entirely defeated, or at best outranked, by a demand that had its origin in private speculation, rather than in such necessities of the vessel as arise in her employment in navigation, and as constitute the basis of a lien in admiralty.

The objections to the claim of the intervenor Peacock are sustained.