## No. 10,058.

### C. A. FISH & Co. vs. M. H. SULLIVAN.

A contract of affreightment by charter party is valid when made by parol, and when terminable at the will of the charterer.

There are two kinds of contract of affreightment by charter party. The first is where the owner agrees to carry a cargo which the charterer agrees to provide. The second is the contract of the instant case, that is to say, where there is an entire surrender by the owner of the vessel to the charterer, who hires the vessel as one hires a house, takes her empty, and provides the officers, crew, provisions, etc.

In such a contract, the charterer is substituted in the place of the owner, and becomes owner for the voyage, or owner *pro hac vice*. Here, therefore, the charterer and not the general owner is liable for materials and supplies.

In an action on account against the alleged owner of a ship for materials and supplies furnished the vessel, under the general issue the defendant may prove a charter party showing a demise of the ship to the charterer during the time covered by the account. Reaffirming R. R. Co. vs. Heirne, 2 Ann. 127.

A PPEAL from the Civil District Court, Parish of Orleans.
*Monroe, J.*

*Aug. Bernau,* for Plaintiffs and Appellees:

Where a ship owner is sought to be held liable for an indebtedness of the ship as such owner, he cannot, under the general issue, be permitted to introduce evidence to prove a charter party. 8 M. 207.

A bill of sale of a ship accompanied by possession does not in itself constitute a good title in law; it is only *prima facie* evidence. It must be shown that the transfer is *bona fide* and for a valuable consideration. 16 Pet. 218; Desty's Manual Shipping and Admiralry.

The registry and enrollment of a vessel under the acts of Congress is, primarily, proof of

her national character and of her home port, and the registry of a bill of sale of a vessel in the name of a person therein named as owner, without other proof of ownership, is not even *prima facie* evidence of such ownership, and a party may be shown to be the real owner, though the ship is registered in the name of another. 23 Penn. St. 76; 16 Pick 401; 1 Cliff. 370; Desty "Shipping and Admiralty," 6 Cal. 343.

Charter parties, though usually made in documentary form, may be made by parol. The presumption of law is against the demise of the vessel by the owner, and in the absence of conclusive proof to the contrary, a charter party will be c onstrued to be a mere contract of affreightment. 78 N. Y. Rep. 50; Carver on Carriage by Sea; Desty on Shipping, etc.; 2 Curtis 102; 14 Wall. 607; 7 A. 337.

The existence of a charter party must be brought to the knowledge of third parties, and where parties were employed by a ship owner as agents and such agents made advances to the ship on the credit of his ownership, the burden of proof is upon the ship owner to show that the agents had notice of the charter party. Secret covenants, prejudicial to third parties, are not favored by the law. 7 Ann. 337; 6 Ann. 461; 30 Fed. Rep. 451, 452; 14 Fed. Rep. 374, 355, 478; 17 Fed. Rep. 816; 12 Fed. Rep. 919; Pritchard Dig. Admiralty, 485; 2 Black 372.

*C. H. Lavillebeuvre* and *Carleton Hunt* for Defendant and Appellant:

Where the facts show, as they do here, that the defendant was not owner of a certain steamship during the time covered by the account sued upon for materials and supplies furnished the vessel, no recovery can be had.

A contract of affreightment by charter party is valid when made by parol, and when terminable at the will of the charterer.

There are two kinds of contract of affreightment by charter party. The first is where the owner agrees to carry a cargo which the charterer agrees to provide. The second is the contract of the instant case, that is to say, where there is an entire surrender by the owner of the vessel to the charterer, who hires the vessel as one hires a house, takes her empty and provides the officers, crew, provisions, etc.

In such a contract the charterer is substituted in the place of the owner, and becomes owner for the voyage, or owner *pro hac vice*. Here, therefore, the charterer and not the general owner is liable for materials and supplies. The Spartan, Ware's Reports, 149, 156; Abbott on Shipping; 6th American Edition of Perkins; Marg. 242; 3d Kent's Comm.; 12th Ed. of Holmes; Marg. page 204 · Likgett vs. Williams, 4 Hare 456, 462; 2 Boulay Paty, 268. 269; Parsons on Maritime Law, 274, 275; Taggard et al. vs. Loring, 16 Mass. R. 339; Perry vs. Osborne, 5th Pickering's R. 422; Cutler vs. Winser, 6th Pickering's R. 338; Vinal vs. Burrill, 16th Pickering's R. 406; Muggridge vs. Evelith, 9th Metcalf's R. 236; Pontchartrain R. R. Co. vs. Hearne, 2d Ann. 131.

The principle of the maritime law is, that whoever deals with the master is, in all cases where the latter is acting within the scope of his duty, entitled to look to the ship as security. The liability of the ship *in specie* is not derived from the civil law, but had its origin in the maritime usages of the middle ages. The liability of the ship is primary, and not collateral or merely accessory. 1 Conkling's U. S. Admiralty 185; The Phebe, Ware's Repts. 263; The Rebecca, Id. 378; Norwich Co. vs. Wright, 13 Wallace Reports 103.

The opinion of the Court was delivered by

TODD, J.    This is a suit to recover of the defendant $3746.14 on account.

The petition alleges substantially that the defendant, a resident of

Pensacola, Florida, is indebted unto the petitioners in the sum above named for advances, payments made and merchandise furnished the steamship Kate Carroll, navigating the gulf stream and to Central America, of which said defendant was the owner.

The answer is a general denial.

From a judgment in favor of the plaintiffs for the amount sued for the defendant has appealed.

There is no dispute about the correctness of the account. That is, that the advances and payments charged were made to the steamer Kate Carroll and the merchandise furnished as stated in the account; but the whole controversy turns upon the question, whether the defendant was the.owner of the vessel during the time covered by the account.

It is shown on the part of the plaintiff that they were the agents of the steamship during all the time she was navigating the waters mentioned.

That the steamer was brought to New Orleans by D. F. Sullivan, the brother of the defendant, and his partner in the lumber business in Pensacola.

That the vessel was first intended to be used in the lumber trade, and was for a while so engaged, but was subsequently and after a short time placed in the fruit trade and made monthly trips between New Orleans and Central America. Also,

That she was constructed at Wilmington, Delaware, at a cost of $95,000, and paid for by D. F. and Martin H. Sullivan, the partners in the lumber business, or as the plaintiffs contend, by Martin H. Sullivan alone. Also,

That the steamer's accounts with the plaintiffs were regularly sent to D. F. & Martin H. Sullivan at Pensacola, and after the death of the former in June, 1884, to the latter alone.

It is further shown that the defendant in his conferences or conversations with the plaintiffs on the subject of the steamer and the business connected with the steamer, referred to it, using the language of the witnesses, as "my steamer," "my boat," etc.

This evidence, if it stood alone, would, we are free to say, warrant a judgment in favor of the plaintiffs, as the judge *a quo* evidently concluded.

But it does not stand alone. The defendant produces a written act of sale of the steamer from the Harlan and Hollingsworth Company of Wilmington, Delaware, by whom it was built, dated May 28, 1883, purporting to convey and sell the vessel to John J. Sullivan, of New

York, and D. F. Sullivan, of Pensacola, ·for $95,000 cash, in the proportion of ⅞ interest to the former and ⅛ to the latter, and the vessel was so registered at the port of New Orleans under the requirements of the U. S. R. Statutes prescribing the regulations of commerce and navigation. And in the specifications of the company which built the steamer, called for by plaintiffs and produced and filed, it is shown that the vessel was built for D. F. Sullivan, of Pensacola, Florida.

Martin H. Sullivan, the defendant, was heard as a witness in the trial in the lower court, and on this question of the ownership of the vessel we extract the following from his examination:

Q. Look at the charges in the bill, in· the first place, and say whether, at the time those charges were made, you were owner in whole or in part of the steamer Kate Carroll?

A. No, sir. I wasn't owner nor holder in whole or in part. I wasn't owner in whole or in part.

Further on he was asked to explain his interest in or his relations to the steamer, and we again quote:

" A. I was acting as agent for the steamer, and she was under my control.

Q.· I understand you were acting as agent for whom?

A. For the owners of her.

Q. That is your brother?

A. Yes,·sir.

Q. That brother who was interested with you in the same business?

A. No, sir.

Q. What brother was that?

A. My brother in New York.

Q. What were the initials of the brother in New York?

A. John J. Sullivan.

Q. Was there not another brother also in Pensacola with you?

A. Yes, sir; there was.

Q. Was he interested in this steamer?

A. Yes, sir; he was interested to the amount of one-eighth of her.

Q. Were you agent for him, too?

A. Yes, sir; agent for him, too."

It is shown that besides being engaged in the lumber business the defendant was, also, the owner and president of the First National

Bank of Pensacola. The cashier of this bank, W. A. S. Wheeler, testified on this point as follows (quoting):

" Q. Mr. Wheeler, will you look at the date of the enrollment of the vessel, and first the date of the bill of sale; what is the date of that?

A. The 28th of May, 1883.

Q. Now turn over and see when it was recorded in the customhouse in New Orleans?

A. November 4th.

Q. Of what year?

A. 1884.

Q. Why was it that it was recorded as late?

A. Because we did not know that it was necessary to have it recorded. I had it recorded myself in the customhouse.

Q. What was your reason for recording it?

A. We did not know that it was necessary before.

Q. Why was it necessary to have it recorded?

A. So as to protect the insurance, and there was a heavy fine for not enrolling it.

Q. Between these two dates, the date of recording and the date of the original bill of sale, in whom was the ownership of the vessel?

A. In John J. Sullivan and D. F. Sullivan.

Q. Were there any other owners in it?

A. No, sir.

Again we find in the record the testimony of McConnell, the clerk and book-keeper of D. F. & Martin H. Sullivan in their lumber business, to the following effect:

Q. Do you know who the owners of the Kate Carroll were?

A. I do, sir.

Q. Who were they?

A. John J. Sullivan and D. F. Sullivan.

Q. Do you know in what proportion?

A. John J. Sullivan owned seven-eighths and D. F. Sullivan one-eighth.

Q. I recollect your being in court when Mr. W. A. S. Wheeler testified?

A. Yes, sir; I was called as a witness and I was present.

Q. You heard what he said?

A. Yes, sir; I heard pretty much all. I may have been absent for a few minutes during the giving of his testimony.

Q. Are you able to say who the owners of the Carroll were during the time covered by the account of the plaintiff in this action ?

A. Well, I am able to say, that from the time she was built up to the time she was sold, which covers the period during which the business was done, in this interim she was owned just as I stated just now, seven-eighths by John J. Sullivan and one-eighth by D. F. Sullivan.

There was a rigid cross-examination of these several witnesses, and some of the facts elicited thereby might be construed as lessening to some extent the weight of their testimony, but the full force of their answers above reported cannot be considered as seriously impaired.

As corroborative of the alleged fact that Martin H. Sullivan was not the owner of the vessel when the indebtedness charged accrued, proof was made that, during the time covered by the indebtedness, the steamer was chartered and run by another person, one John B. Guttman.

Objection was made that such proof was not admissible under the general issue, but that a charter party should have been specially pleaded.

Under the authority of the case of the Pontchartrain R. R. Co. vs. Hearne, 2 Ann. 129, where the precise point was adjudicated, we think the testimony was properly admitted.

This charter party was made by parol, and the contract was between D. F. Sullivan, one of the owners, and John B. Guttman, and terminable at the will of the owners.

There is no dispute between the parties that a valid charter party may be made by parol. 1 Parsons Maritime Law, 274; 16 Mass. R. 339 ; 5th Pickering, 422; 6th Ib. 338.

A charter party is of two kinds. One is where the owner agrees to carry a cargo which the charterer agrees to provide.

The second is where there is an entire surrender by the owner of the vessel to the charterer who hires the vessel as one hires a house, takes her empty and provides the officers and crew provisions ; and, in short, the entire outfit.

In such a contract the charterer is substituted in the place of the owner, and becomes the owner for the voyage, or owner *pro hac vice*, and as such owner is liable for materials, supplies, etc. The Spartan, Ware's Reports, 149, 156 ; Abbott on Shipping ; 6th American Edition of Perkins ; Marg. 242 ; 3d Kent's Comm.; 12th Ed. of Holmes ; Marg. page 204 ; Lidgett vs. Williams, 4 Hare 456, 462 ; 2 Boulay Paty, 268, 269 ; Parsons on Maritime Law, 274, 275 ; Taggard et al. vs. Loring,

16 Mass. R. 339 ; Perry vs. Osborne, 5th Pickering's R. 422 ; Cutler vs. Winser, 6th Pickering's R. 338 ; Vinal vs. Burrill, 16th Pickering's R. 406 ; Muggridge vs. Evelith, 9th Metcalf's R. 236 ; Pontchartrain R. R. Co. vs. Hearne, 2d Ann. 131.

This charter party is established by the same witnesses to whom we have referred.

Their entire testimony has been severely criticised and is charged to be unreliable, but it was not sought to be impeached during the trial by assailing directly their veracity; and unless we reject their testimony as wholly unworthy of belief and place the stigma of perjury upon it, and at the same time pronounce the act of sale of the vessel and its registry as fictitious and simulated, we cannot escape the conclusion that the defendant was not the owner of the "Kate Carroll" during the time covered by the account sued on.

It is denied that the plaintiff ever had notice of the charter of the vessel, and one of the plaintiffs testifies to this effect. He is, however, opposed by the testimony of at least two witnesses ; and besides, it is shown to our satisfaction that the money for the charter of the vessel was paid by Guttman, the charterer, through the plaintiffs—a fact that certainly brings home to them a knowledge of the fact.

There are several bills of exceptions in the record besides the one noticed above touching the admissibility of evidence allowed; we have examined them all and do not pass upon them separately, because our determination of them one way or the other could not alter our conclusion announced touching the pivotal fact of the controversy.

We have made a close study of the evidence in this case, and this examination has been the more thorough, perhaps, out of a disinclination we always feel of disturbing the conclusion reached by the lower court upon an issue involving mainly a question of fact, but this examination has served to make us realize more fully the great preponderance of evidence in favor of the defendant and produced the conviction that he is not legally liable for the debt sued for.

It is therefore ordered, adjudged and decreed that the judgment of the lower court be annulled, avoided and reversed, and that the plaintiffs' demand be rejected at their costs in both courts.