AIRD v. WEYERHAEUSER S. S. CO.

No. 9294.

Circuit Court of Appeals
Third Circuit.

Argued June 2, 1947.

Reargued Feb. 18, 1948.

Decided Aug. 4, 1948.

Abraham E. Freedman, of Philadelphia, Pa. (Charles Lakatos and Freedman, Landy & Lorry, all of Philadelphia, Pa., on the brief), for appellant.

Thomas E. Byrne, Jr., of Philadelphia, Pa. (Timothy Jay Mahoney, Jr., and Kru-

sen, Evans & Shaw, all of Philadelphia, Pa., on the brief), for respondent-appellee.

Leavenworth Colby, Sp. Asst. to Atty. Gen. (Herbert A. Bergson, Acting Asst. Atty. Gen., and J. Frank Staley, Sp. Asst. to Atty. Gen., Admiralty and Shipping Section, Department of Justice, on the brief), for amicus curiae.

Before BIGGS, MARIS, GOODRICH, McLAUGHLIN, and O'CONNELL, Circuit Judges.

MARIS, Circuit Judge.

The libellant, John K. Aird, filed in the district court for the Eastern District of Pennsylvania his libel in personam in admiralty against Grace Line, Inc. and Weyerhaeuser Steamship Company seeking to recover wages, maintenance and transportation expense by virtue of his alleged wrongful discharge from employment as radio officer on the S. S. Walt Whitman. On May 29, 1942 at Portland, Oregon, Aird had signed shipping articles as radio operator on the Walt Whitman for a voyage from Portland for a period not exceeding twelve months. In the course of the voyage the Walt Whitman put in for cargo at the Army Base at Brooklyn in the New York Port of Embarkation. Shortly after arrival there on August 12, 1942 Aird was removed from the ship at the instance of the superintendent of the Army Transport Service who stated that his services were no longer desired. On the following day Aird signed off the articles under protest and was paid his wages in full up to that date. The circumstances involved in his removal from the ship are fully set out in the opinion of the district court, 63 F. Supp. 832, and need not be repeated here.

Discontinuing his libel as to Grace Line, Inc., Aird proceeded to trial against the respondent, Weyerhaeuser Steamship Company. Following the trial the district court concluded that Weyerhaeuser was not responsible for Aird's removal from the Walt Whitman and his consequent discharge as radio operator of the vessel and dismissed the libel. The present appeal by Aird followed. The appeal has been twice argued in this court. After full consideration we conclude that the judgment of the district court should be affirmed but for reasons somewhat different from those on which it based its conclusion.

It appears that the Walt Whitman was owned by the United States. It also appears that Weyerhaeuser was acting as general agent for the United States under a general agency service agreement dated February 21, 1942. Under that agreement Weyerhaeuser was employed by the United States as general agent to manage and conduct the business of the Walt Whitman.[1] It is not necessary for the purposes of this case to delimit exactly the extent of Weyerhaeuser's authority. It is clear from the agreement, however, that Weyerhaeuser's authority did not include control of the navigation and management of the vessel itself as distinguished from the management of the vessel's business. It thus appears that Weyerhaeuser's responsibility was limited to that of ship's husband.[2]

---

[1] Article 1 of the general agency agreement provides:

"The United States appoints the General Agent as its agent and not as an independent contractor, to manage and conduct the business of vessels assigned to it by the United States from time to time."

[2] Justice Story in his treatise on Agency (9th Ed. § 35) says:

"* * * generally, the person, designated as ship's husband, * * * is understood to be the general agent of the owners, in regard to all the affairs of the ship in the home port. As such general agent, he is instructed with authority to direct all proper repairs and equipments, and outfits for the ship; to hire the officers and crew; to enter into contracts for the freight or charter of the ship, if that is her usual employment; and to do all other acts necessary and proper to dispatch her for and on her intended voyage."

See also Mitchell v. Chambers, 1880, 43 Mich. 150, 5 N.W. 57, 38 Am.Rep. 167; The Ole Oleson, C.C.Wis.1884, 20 F. 384; Vol. 39, Words and Phrases, Perm.Ed. page 205.

General Order 12 of the War Shipping Administration provides:

"A General Agent is one who takes care of the vessel's business on behalf of the War Shipping Administration, under a standard form of service agreement (GAA-4-4-42), appoints Agents as di-

The portion of the general agency service agreement pertinent to the case before us is Article 3A(d), which is as follows:

"The General Agent shall procure the Master of the vessels operated hereunder, subject to the approval of the United States. The Master shall be an agent and employee of the United States, and shall have and exercise full control, responsibility and authority with respect to the navigation and management of the vessel. The General Agent shall procure and make available to the Master for engagement by him the officers and men required by him to fill the complement of the vessel. Such officers and men shall be procured by the General Agent through the usual channels and in accordance with the customary practices of commercial operators and upon the terms and conditions prevailing in the particular service or services in which the vessels are to be operated from time to time. The officers and members of the crew shall be subject only to the orders of the Master. All such persons shall be paid in the customary manner with funds provided by the United States hereunder."

It appears that pursuant to this provision of the service agreement Weyerhaeuser procured Oscar W. Carlson to be master of the Walt Whitman and Carlson thus became the agent and employee of the United States in control of the navigation and management of the vessel. Subsequently Weyerhaeuser as general agent of the United States and pursuant to the service agreement procured and made available to Carlson suitable persons for engagement by him as the crew of the vessel. Among these was the libellant, Aird. Shipping articles were prepared and on May 29, 1942, in the presence of a deputy shipping commissioner, the articles were signed by Carlson as master and by Aird and the other members of the crew which Weyerhaeuser had thus procured for the vessel.

Shipping articles have long been carefully regulated by statute for the benefit and protection of the crew.[3] Their form is prescribed in detail and they are required to be signed in the presence of a shipping commisssioner. When shipping articles are thus signed by the master and members of the crew they constitute the contract of employment.[4] As such they bind not only the master individually but the ship which he commands and the owner whom he represents, thus affording to the seamen the three-fold remedy for their wages which the maritime law provides.[5] The law imposes liability upon the owner because the contract is made for his use and the services inure to his benefit.[6] By the same token the law makes the owner, as well as the master, liable for the wrongful discharge of a seaman.[7]

The law imposes the liability for wages upon the owner, however, only if he is the operating owner whose agent the master is.[8] If the owner of the vessel has

---

rected by the War Shipping Administration to handle those functions which relate to the handling of the cargo and functions incidental thereto, and assumes those duties when not otherwise instructed, obtains all accounting for all revenue and expenses and accounts to the War Shipping Administration for all business of the vessel." 7 F.R. 4496, 46 C.F.R. Cum.Supp. § 306.3.

[3] R.S. §§ 4511 et seq., as amended, 46 U.S.C.A. §§ 564 et seq.

[4] Oliver v. Alexander, 1832, 6 Pet. 143, 144, 31 U.S. 143, 144, 8 L.Ed. 349; Peninsular & Occidental S. S. Co. v. National Labor R. Bd., 5 Cir., 1938, 98 F.2d 411, 414, certiorari denied 305 U.S. 653, 59 S.Ct. 248, 83 L.Ed. 423; The Seatrain New Orleans, 5 Cir., 1942, 127 F.2d 878.

[5] Farrel v. McClea, 1788, 1 Dallas 392, 1 L.Ed. 191; Bronde v. Haven, D.C.Pa.

1836, 4 Fed.Cas. page 211, No. 1924; Everett v. United States, D.C.Wash.1921, 277 F. 256, 258 affirmed 9 Cir., 284 F. 203, certiorari denied 261 U.S. 615, 43 S.Ct. 361, 67 L.Ed. 828.

[6] Bishop v. Shepherd, 1839, 40 Mass. 492, 496.

[7] R.S. §§ 4527, 4529, 46 U.S.C.A. §§ 594, 596; Hunt v. Colburn, D.C.Mass.1853, 12 Fed.Cas. pages 905, 906, No. 6886.

[8] In Sheriffs v. Pugh, 1867, 22 Wis. 273, 276, 94 Am.Dec. 600, the court said: "* * * if the person chartering the vessel has the entire control of it, so that the captain and seamen are primarily in his employ, and he runs it at his expense, then he is regarded as the owner for the time being, and the general owner is relieved from liability. But if, notwithstanding the charter-party, the general owner retains the possession of

610

given entire possession and control of it to another by virtue of a demise charter or otherwise and the master is, therefore, the agent of the charterer and not of the owner, the person thus put in possession and control of the vessel becomes special owner for the voyage and assumes all the responsibilities of owner with respect, inter alia, to the wages of the seamen and their wrongful discharge.[9] Such a person is frequently described as "owner pro hac vice" which is merely a convenient expression to indicate that he stands in the place of the owner for the voyage or service contemplated and bears the owner's responsibilities, even though the latter remains the legal owner of the vessel.[10]

In the case before us the shipping articles which Aird signed with the master and which thus constituted his contract of employment showed on their face that the United States, through its agency the U. S. Maritime Commission, was the owner of the vessel. Since Carlson, the master, was in fact the agent of the United States it is clear that the articles disclosed to Aird that the United States was the employer to whom he must look for his wages. It necessarily follows that Aird's claim, if he has any, arising from his discharge from employment on the Walt Whitman is against Carlson as master and the United States as owner and against them alone, unless the relationship of Weyerhacuser to the vessel was such as to impose liability upon it as owner of the vessel pro hac vice or in some other way as Aird's employer.

Weyerhaeuser, as we have seen, was acting in this transaction solely as general agent for the United States in the general capacity of ship's husband. The form of service agreement under which it acted has been authoritatively held not to constitute the general agent the owner of the vessel pro hac vice.[11] Nonetheless under the service agreement it did have responsibility for procuring persons for employment as members of the crew and it did so procure Aird. But since in so doing Weyerhaeuser was acting solely as agent for the owner and inasmuch as its principal was disclosed to Aird on the face of the articles which he signed it did not thereby become a party to the employment contract or liable for wages due thereunder even if we assume that it and not the master actually hired Aird.[12]

We do not overlook the fact that the shipping articles which Aird signed contained the statement that Weyerhaeuser was "charterer" of the vessel. We do not think that this fact aids Aird, however. In the first place it is perfectly clear that this statement was erroneous and that Weyerhaeuser was acting solely as agent of the United States in the general capacity of ship's husband and was in no sense a charterer. In the second place even if true it would not without more compel the conclusion that Weyerhaeuser would be liable for the wages of the seamen of the Walt Whitman. For there are two distinct kinds of charter parties.[13] On the one hand are those by which the use of the ves-

---

the vessel so far as to run it by his own captain and seamen, the latter will be in his employ, and he will be liable." Scull v. Raymond, D.C.N.Y.1883, 18 F. 547, 550.

[9] In Everett v. United States, 9 Cir., 1922, 284 F. 203, 205, certiorari denied 261 U.S. 615, 43 S.Ct. 361, 67 L.Ed. 828, the court said: "* * * where the general owner places the ship in the exclusive possession and control of another, such other becomes the owner pro hac vice with respect to liability for wages and other expenses."

In the Norland, 9 Cir., 1939, 101 F.2d 967, 971, it was said: "The test of whether a charter is a complete demise of a vessel so as to make the charterer owner pro hac vice is whether entire

command and possession of the vessel, and consequent control over its navigation, has been surrendered to the charterer."

[10] Scull v. Raymond, D.C.N.Y.1883, 18 F. 547, 550.

[11] Caldarola v. Eckert, 1947, 332 U.S. 155, 159, 67 S.Ct. 1569, 91 L.Ed. 1968.

[12] Shilman v. United States, 2 Cir., 1947, 164 F.2d 649, certiorari denied 68 S.Ct. 608.

[13] "A charter-party is of two kinds: One is where the owner agrees to carry a cargo which the charterer agrees to provide; the second is where there is an entire surrender by the owner of the vessel to the charterer, who hires the vessel as one hires a house, takes her empty, and provides the officers and

sel is given without full possession and control of it. Such a charter party is frequently no more than a contract of affreightment. On the other hand, however, are those demise charters under which the charterer is given sole possession and control of the vessel for the voyage or service which is contemplated. As we have seen it is only in the case of a charter of the latter sort that the charterer becomes owner pro hac vice and liable for the seamen's wages. There is, however, a general presumption that the owner does not mean to put his vessel into the possession of the charterer to this extent.[14] Accordingly Aird would not be justified in relying upon the statement in the articles that Weyerhaeuser was charterer as a basis for holding it liable as his employer.

Suggestion is made that the War Shipping Administration Clarification Act of March 24, 1943 [15] conferred upon Aird a right to sue Weyerhaeuser for his discharge. Hust v. Moore-McCormack Lines, 1946, 328 U.S. 707, 66 S.Ct. 1218, 90 L.Ed. 1539, is also relied on. But we see no basis for holding that the Clarification Act conferred upon seamen any new right of action against private persons. As we have pointed out in Gaynor v. Agwilines, Inc., 3 Cir., 169 F.2d 612, that act conferred upon seamen employed by the United States certain rights of privately employed seamen in lieu of their rights as government employees but provided that the rights thus conferred were to be enforceable only against their employer, the United States.

Nor does the decision of the Supreme Court in the Hust case aid Aird here. As pointed out in Caldarola v. Eckert, 1947, 332 U.S. 155, 159, 67 S.Ct. 1569, 1571, 91 L. Ed. 1968, that case merely held that under an agency contract such as Weyerhaeuser's service contract here "the Agent was the 'employer' of an injured seaman as that term is used in the Jones Act, and a seaman could therefore bring the statutory action against such an 'employer'." The Hust decision was concerned solely with tort liability under the Jones Act, 46 U.S. C.A. § 688. The Supreme Court in that case had no occasion to consider whether such an agent as Weyerhaeuser would be personally bound as employer of seamen whom it might procure for employment by a disclosed principal. Obviously the latter problem involves wholly different legal questions.

In view of our conclusion that Weyerhaeuser was not liable to Aird for wages under his employment contract it becomes unnecessary to consider whether, if the fact were otherwise, Weyerhaeuser could be held responsible for Aird's discharge.

The judgment of the district court will be affirmed.

BIGGS, Circuit Judge (concurring).

I am forced to the conclusion that the Supreme Court in its opinion in Caldarola v. Eckert, 332 U.S. 155, 67 S.Ct. 1569, 91 L.Ed. 1968, overruled implicitly or, at least limited the doctrine of Hust v. Moore-McCormack Lines, 328 U.S. 707, 66 S.Ct. 1218, 90 L.Ed. 1534, to such a degree that nothing now remains upon which Aird's position in the case at bar properly may be bottomed. In so concluding I am aware that the majority opinion in Hust did not hold that the General Agent was the owner pro hac vice of the S. S. "Mark Hanna" for Mr. Justice Rutledge limited the court's conclusion in that regard albeit he stated 328 U.S. 723, 724, 66 S.Ct. 1226, that "the Maritime Commission's standard contract make[s] it hardly more than dubious that respondent did not stand pro hac vice as employer with the Government." In the con-

---

provisions, and, in short, the entire outfit. In such a contract the charterer is substituted in place of the owner, and becomes the owner for the voyage, or owner pro hac vice, and, as such owner is liable for materials, supplies, etc." Fish v. Sullivan, 1888, 40 La.Ann. 193, 3 So. 730, 732.

See also Reed v. United States, 1870, 11 Wall. 591, 600, 78 U.S. 591, 600, 20 L.Ed. 220; Leary v. United States, 1871, 14 Wall. 607, 610, 611, 81 U.S. 607, 610, 611, 20 L.Ed. 756.

[14] Reed v. United States, 1870, 78 U.S. 591, 601; Hansen v. E. I. Du Pont De Nemours & Co., 2 Cir., 1929, 33 F.2d 94, 96, certiorari denied 280 U.S. 587.

[15] 50 U.S.C.A.Appendix, § 1291.

curring opinion of Mr. Justice Douglas, with whom Mr. Justice Black agreed, the liability of the General Agent is based squarely on the proposition that it was to be deemed to be the owner pro hac vice of the vessel insofar as a seaman was concerned.

In the Caldarola case the Supreme Court held expressly that the General Agent was not the owner pro hac vice of the S. S. "Everagra" albeit this conclusion was based upon the New York law as set out in Cullings v. Goetz, 256 N.Y. 287, 176 N.E. 397. Moreover in the majority opinion in Caldarola Mr. Justice Frankfurter explained and expressly limited the application of the principle of the Hust case by stating: "We there held that under the Agency contract the Agent was the 'employer' of an injured seaman as that term is used in the Jones Act, and a seaman could therefore bring the statutory action against such an 'employer'". I had thought that a distinction could not be based upon the status of the General Agent as "employer" under the Jones Act and its standing in its other relations to a seaman. As limited or interpreted by Caldarola the doctrine of the Hust case cannot give Aird the standing to maintain his suit.

I therefore concur in the result reached by this court.