GEORGE M. AUTEN, Respondent, *v.* JAMES GORDON BENNETT, Appellant.

*Charter party — implied warranty of seaworthiness — the owner must reimburse the charterer for damages from defects — when the charterer is not liable for the negligence of the crew.*

In every charter party there is an implied warranty that the vessel is seaworthy and suitable for the service in which she is to be employed. This warranty relates to latent and patent defects. The owner is bound to keep the vessel in repair unless prevented by perils of the sea or unavoidable accident, and if a defect without any apparent cause be developed it is to be presumed that it existed when the service began.

The owner of the vessel must reimburse the charterer for damages sustained by the latter in consequence of a defect, known or unknown, which rendered the vessel unseaworthy, unless it appears that such defect was the result of peril of the sea or unavoidable accident.

A newspaper chartered a vessel for use in gathering news during the Spanish-American war. The charter party provided : "The consideration of this charter is Three thousand Dollars per month ($3,000) and I, Chas. H. Merrill, do agree to furnish boat, pay crew's wages, not to exceed $800 per month, and uniforms, and agree to deliver the *Mindora* at New York.

"The New York *Herald* agrees to furnish all supplies, also a Marine and Fire Insurance, also insure the yacht against the perils of war and return her in as good condition as when she was received free from all debts whatsoever. It is also agreed that the New York *Herald* returns the yacht to New York."

The owner appointed the captain, the master and all of the crew, who managed and navigated the vessel. The newspaper sent reporters aboard the vessel who directed the voyage of the vessel, but took no part in its management or navigation.

*Held,* that the master and crew were the servants of the owner and not those of the newspaper, and that the latter was not liable for any negligence on their part.

SECOND DEPARTMENT, NOVEMBER TERM, 1903.     [Vol. 88.

APPEAL by the defendant, James Gordon Bennett, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Kings on the 26th day of January, 1903, upon the verdict of a jury, and also from an order entered in said clerk's office on the 22d day of January, 1903, denying the defendant's motion for a new trial made upon the minutes.

*Robert W. Candler* [*William Jay* and *Flamen B. Candler* with him on the brief], for the appellant.

*Leopold Leo* [*Robert P. Orr* with him on the brief], for the respondent.

GOODRICH, P. J.:

The plaintiff, as assignee of Charles H. Merrill, has recovered a judgment against the defendant as owner of the New York *Herald* for breach of a charter of the steam yacht *Mindora*. The charter party reads as follows:

"NEW YORK, *June* 10, 1898.

"This is to certify that I, Chas. H. Merrill, of Exeter, New Hampshire, do hereby agree to charter my steam yacht *Mindora* to the New York *Herald* for two months or longer, and it is also agreed that the New York *Herald* has the privilege of extending the charter for as long a period of time as they wish at the expiration of the two months; it is agreed that this charter commences on the 10 day of June and expires on the 10 day of August, unless otherwise previously arranged. The consideration of this charter is Three thousand Dollars per month ($3,000) and I, Chas. H. Merrill, do agree to furnish boat, pay crew's wages, not to exceed $800 per month, and uniforms, and agree to deliver the *Mindora* at New York.

"The New York *Herald* agrees to furnish all supplies, also a Marine and Fire Insurance, also insure the yacht against the perils of war and return her in as good condition as when she was received free from all debts whatsoever. It is also agreed that the New York *Herald* returns the yacht to New York.

"WILLIAM C. REICK

"for JAMES GORDON BENNETT.

"CHARLES H. MERRILL."

The yacht was delivered to the defendant at New York on June 12, 1898, and returned to the owner on August twelfth. The charter money of the yacht has been paid, but the owner alleges that the defendant did not "return her in as good condition as when she was received," but in such a damaged condition as necessitated repairs amounting to over $6,000.

In his answer the defendant admitted that while the yacht was under the control of the master and crew furnished by the owner, "the defendant entered into the possession" and so remained until her redelivery to the owner; he also alleged that the owner represented her to be staunch, seaworthy and able to log twelve knots an hour and suitable to be used in southern waters among the West India islands in gathering news for the *Herald* during the Spanish-American war; that she was in fact unseaworthy and in bad condition and not as speedy as represented; that she had to be repaired by the defendant at great cost; that he was compelled to charter another boat, the expense of all of which amounted to $10,000, which he claimed to recoup and set off against the plaintiff's claim, and he prayed for a dismissal of the complaint.

It is contended by the defendant that under the terms of the charter party he was liable only for injury to the yacht occasioned by the negligence of himself or his servants and was not liable for damages occasioned by her unseaworthiness, perils of the sea or negligence of the officers or crew of the yacht, as they were the servants of the owner.

The law is well settled that in every charter party there is an implied warranty that the vessel is seaworthy and suitable for the service in which she is to be employed; that this relates to latent and patent defects; that the owner is bound to keep her in repair unless prevented by perils of the sea or unavoidable accident, and that if a defect without any apparent cause be developed it is to be presumed that it existed when the service began. (*Work* v. *Leathers*, 97 U. S. 379; *The Caledonia*, 157 id. 124; *Haulenbeek* v. *Hunt*, 49 App. Div. 47.) Such being the presumption, we are called upon to decide whether the owner has produced any evidence to rebut the presumption of unseaworthiness in respect of damages resulting from a defective gasket, which is a piece of leather or other packing

inserted between flanges to make a tight joint. It is proved that just before the yacht commenced her charter, Neal, the engineer, who was in the employ of the owner both before and during the charter, put a leather gasket in the condenser and steam pipes which opened outward below the water line. When such a gasket is bad condenser pipes leak. There is evidence that a good gasket ought to last three years. One of the plaintiff's witnesses testified "when the joints are not properly put together, and this leather was under the boat and being saturated with salt water, it would very soon rot and become useless. You might as well put a piece of that blotting paper in." On July second, when the yacht was in Cuban waters, the gasket gave out and let salt water into the condenser pipe, and this salt water, being pumped into the boiler, caused sections of the latter to burst. The vessel was put in a dry dock and these sections were taken out. It was found that the gasket was gone and a new gasket was put in and the leaking ceased. As this leak was occasioned by the loss of the gasket which had been in use only a few months and which, if good, ought to have lasted several years, the presumption is that the leak occurred through a defect in the gasket unless there is evidence to show that it occurred through perils of the sea or unavoidable accident. The evidence is not sufficient to show that this was the fact, and the owner has not lifted the burden and proved that the leak occurred through a peril of the sea or unavoidable accident. He is, therefore, liable to make good the damages which the defendant sustained by reason of the defect, for such a defect rendered the vessel unseaworthy. This is true whether the defect was known or unknown. ( *Work* v. *Leathers, supra.*)

The court properly charged that the charter-party contained an implied covenant that the yacht was seaworthy, and submitted to the jury the question whether she was or was not seaworthy, instructing them that if she was not, then the defendant was entitled to offset against the plaintiff's claim any damages resulting therefrom ; and it is probable that the jury found unseaworthiness, inasmuch as a deduction was made from the plaintiff's claim, but it is not possible to say what effect resulted from a subsequent instruction.

The court charged that " under all the circumstances of this case, this defendant was bound to restore her to as good condition as she

was before, and defendant is liable for whatever was the reasonable and necessary expense of doing it; since, confessedly, she was not returned in that condition." To this the defendant excepted and requested the court to charge: "That the defendant is not liable for injuries from perils of the sea." This was refused, and the court charged "that the liability extends to every depreciation of her condition which might happen from any cause whatever while she was in his possession, except a destruction of her such that she could not be returned at all." To this the defendant excepted. I think that this charge was too broad. Even if the charter party was a demise of the yacht to the defendant, which it was not, it contained an implied warranty that she was seaworthy. If then the damages of the defendant resulted from her unseaworthiness, the owner was liable for breach of warranty, and there is ample evidence that damage and delay resulted from a defective gasket. Hence the instruction, that the defendant's liability extended to every depreciation from any cause whatever except her total destruction, was error, for the owner and not the defendant was responsible for injuries arising from unseaworthiness.

Defendant's counsel requested the court to charge that the defendant is not liable for any negligence or carelessness of the master or crew. After some discussion, the court said: "I will not charge it. I think the crew was yours and under your direction; whatever they did you had to make good." And to this the defendant excepted. The correctness of this charge depends upon the construction to be given to the charter party, as to the ownership of the vessel during the life of the charter. Here we must remember the rule of law applicable to instruments of this character.

In *Raymond* v. *Tyson* (17 How. [U. S.] 53, 59) it was said, "it must be remembered that a charter party is an informal instrument as often as otherwise, having inaccurate clauses, and that on this account they must have a liberal construction, such as mercantile contracts usually receive, in furtherance of the real intention of the parties and usage of trade. So Lord MANSFIELD said a long time since. Abbott, in his treatise relative to merchant ships and seamen, Story's edition, 188, gives the rule of construction very much in the same words; but perhaps with more precision. 'The general rule which our courts of law have adopted, in the construction of

this as well as other mercantile instruments, is, that the construction should be liberal, agreeable to the real intention of the parties, and conformable to the usage of trade in general, and of the particular trade to which the contract relates.' Chancellor KENT, in his 47th chapter on the contract of Affreightment, cites the rule approvingly."

With this rule in mind, let us examine the contract. The owner chartered his vessel to the defendant for two months or longer, agreeing to pay " crew's wages not to exceed $800 per month." That included master's wages. There is nothing to contradict the presumption that the owner appointed Captain Gibson, the master, and all of the crew. It appears affirmatively that he appointed Neal and Willex, the engineers, in whose department was the defective gasket. The plaintiff's witness, Neal, testified that the yacht was in charge of Captain Gibson, and this necessarily, so far as the navigation of the vessel was concerned. It is true that the persons sent aboard by the defendant as reporters directed the voyages of the vessel, but they certainly had no connection with the management and navigation of the vessel. This is more evident from the fact that the damage to the condenser and boiler resulted either from the vessel's unseaworthiness or her faulty navigation, or the perils of the sea, not from the power of Bennett to direct her destination. Indeed, it was proved that on one occasion the master was directed to go to Guantonomo, and started, but, without orders from any of the defendant's agents, returned, and, when asked the reason, stated that the condenser was broken and he had only enough steam to get back to harbor.

Defendant did not have exclusive possession of the yacht within the authorities cited below. The words " deliver " and " return " are to be construed liberally and not in a technical sense. They do not control the facts or the other parts of the charter party.

In *Reed* v. *United States* (78 U. S. 591, 600, 601), Mr. Justice CLIFFORD said : " Affreightment contracts are of two kinds, and they differ from each other very widely in their nature as well as in their terms and legal effect. Charterers or freighters may become the owners for the voyage without any sale or purchase of the ship, as in cases where they hire the ship and have by the terms of the contract, and assume, in fact, the exclusive possession, command and

navigation of the vessel for the stipulated voyage. But where the general owner retains the possession, command and navigation of the ship, and contracts for a specified voyage, as, for example, to carry a cargo from one port to another, the arrangement in contemplation of law is a mere affreightment sounding in contract and not a demise of the vessel, and the charterer or freighter is not clothed with the character or legal responsibility of ownership. Unless the ship herself is let to hire, and the owner parts with the possession, command and navigation of the same, the charterer or freighter is not to be regarded as the owner for the voyage, as the master, while the owner retains the possession, command and navigation of the ship, is the agent of the general owner, and the mariners are regarded as in his employment and he is responsible for their conduct. Courts of justice are not inclined to regard the contract as a demise of the ship if the end in view can conveniently be accomplished without the transfer of the vessel to the charterer, but where the vessel herself is demised or let to hire, and the general owner parts with the possession, command and navigation of the ship, the hirer becomes the owner during the term of the contract, and, if need be, he may appoint the master and ship the mariners, and he becomes responsible for their acts."

Mr. Justice FIELD, in *Leary* v. *United States* (81 U. S. 607, 610, 611), said: " There is no doubt that under some forms of a charter party the charterer becomes the owner of the vessel chartered for the voyage or service stipulated, and, consequently, becomes subject to the duties and responsibilities of ownership. Whether in any particular case such result follows must depend upon the terms of the charter-party considered in connection with the nature of the service rendered. The question as to the character in which the charterer is to be treated is, in all cases, one of construction. If the charter-party let the entire vessel to the charterer with a transfer to him of its command and possession and consequent control over its navigation, he will generally be considered as owner for the voyage or service stipulated. But, on the other hand, if the charter-party let only the use of the vessel, the owner at the same time retaining its command and possession, and control over its navigation, the charterer is regarded as a mere contractor for a designated service, and the duties and responsibilities of the owner are not changed. In the

first case the charter-party is a contract for the lease of the vessel; in the other it is a contract for a special service to be rendered by the owner of the vessel. In examining the adjudged cases on this subject we find some differences of opinion, especially in the earlier cases, as to the effect to be given to certain technical terms used in the charter-party in determining whether the instrument parts with the entire possession and control of the vessel, but no difference as to the rule of law applicable when the construction is settled. All the cases agree that entire command and possession of the vessel, and consequent control over its navigation, must be surrendered to the charterer before he can be held as special owner for the voyage or other service mentioned. The retention by the general owner of such command, possession and control is incompatible with the existence at the same time of such special ownership in the charterer."

It follows from these authorities that it was error to charge that the crew were the servants of the defendant and that he was liable for their acts.

For these reasons, I think the judgment and order should be reversed and a new trial granted.

BARTLETT, WOODWARD and HOOKER, JJ., concurred; JENKS, J., concurred in result.

Judgment and order reversed and new trial granted, costs to abide the event.