AUTEN v. BENNETT.

(Supreme Court, Appellate Division, Second Department. November 20, 1903.)

1. CHARTER PARTY—SEAWORTHINESS OF VESSEL—EVIDENCE.
    Evidence *held* to show that a gasket in a chartered vessel was defective and rendered the vessel unseaworthy at the time of chartering her.
2. SAME—LIABILITY OF CHARTERER.
    Though a charterer agreed to return a vessel in as good condition as when received, his liability does not extend to depreciation resulting from unseaworthiness, since every charter party contains an implied warranty of seaworthiness.
3. SAME—NEGLIGENCE OF CREW.
    Where, under the terms of a charter party, the owner of the vessel furnishes the crew, which controls the navigation, the charterer is not liable for depreciation resulting from the crew's negligence, though the owner agrees "to deliver" the vessel to the charterer, who agrees to return her in as good condition as when received.

Appeal from Trial Term, Kings County.

Action by George M. Auten against James Gordon Bennett. From a judgment in favor of plaintiff, defendant appeals. Reversed.

Argued before GOODRICH, P. J., and BARTLETT, JENKS, WOODWARD, and HOOKER, JJ.

R. W. Candler (Wm. Jay and Flamen B. Candler, on the brief), for appellant.

Leopold Leo (Robt. P. Orr, on the brief), for respondent.

GOODRICH, P. J. The plaintiff, as assignee of Charles H. Merrill, has recovered a judgment against the defendant, as owner of the New York Herald, for breach of a charter of the steam yacht Mindora. The charter party reads as follows:

"New York, June 10, 1898.

"This is to certify that I, Chas. H. Merrill, of Exeter, New Hampshire do hereby agree to charter my steam yacht Mindora to the New York Herald for two months or longer, and it is also agreed that the New York Herald has the privilege of extending the charter for as long a period of time as they wish at the expiration of the two months; it is agreed that this charter commences on the 10 day of June and expires on the 10 day of August, unless otherwise previously arranged. The consideration of this charter is Three thousand Dollars per month ($3000) and I, Chas. H. Merrill do agree to furnish boat, pay crew's wages, not to exceed $800 per month, and uniforms, and agree to deliver the Mindora at New York.

"The New York Herald agrees to furnish all supplies, also a Marine and Fire Insurance, also insure the yacht against the perils of war and return her in as good condition as when she was received free from all debts whatsoever. It is also agreed that the New York Herald returns the yacht to New York.

                                        "William C. Reick,
                                        "For James Gordon Bennett.
                                "Charles H. Merrill."

The yacht was delivered to the defendant at New York on June 12, 1898, and returned to the owner on August 12th. The charter money of the yacht has been paid, but the owner alleges that the defendant did not "return her in as good condition as when she was received," but in such a damaged condition as necessitated repairs amounting to over $6,000.

In his answer the defendant admitted that, while the yacht was under the control of the master and crew furnished by the owner, "the defendant entered into the possession" and so remained until her redelivery to the owner. He also alleged that the owner represented her to be staunch, seaworthy, and able to log 12 knots an hour, and suitable to be used in southern waters among the West Indian Islands in gathering news for the Herald during the Spanish-American War; that she was in fact unseaworthy, and in bad condition, and not as speedy as represented; that she had to be repaired by the defendant at great cost; that he was compelled to charter another boat—the expense of all of which amounted to $10,000, which he claimed to recoup and set off against the plaintiff's claim, and he prayed for a dismissal of the complaint.

· It is contended by the defendant that under the terms of the charter party he was liable only for injury to the yacht occasioned by the negligence of himself or his servants, and was not liable for damages occasioned by her unseaworthiness, perils of the sea, or negligence of the officers or crew of the yacht, as they were the servants of the owner. The law is well settled that in every charter party there is an implied warranty that the vessel is seaworthy and suitable for the service in which she is to be employed; that this relates to latent and patent defects; that the owner is bound to keep her in repair unless prevented by perils of the sea or unavoidable accident; and that if a defect, without any apparent cause, be developed, it is to be presumed that it existed when the service began. Work v. Leathers, 97 U. S. 379, 24 L. Ed. 1012; The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644; Haulenbeck v. Hunt, 49 App. Div. 47, 63 N. Y. Supp. 405. Such being the presumption, we are called upon to decide whether the owner has produced any evidence to rebut the presumption of unseaworthiness in respect of damages resulting from a defective gasket, which is a piece of leather or other packing inserted between flanges to make a tight joint. It is proved that, just before the yacht commenced her charter, Neal, the engineer, who was in the employ of the owner both before and during the charter, put a leather gasket in the condenser and steam pipes which opened outboard below the water line. When such a gasket is bad, condenser pipes leak. There is evidence that a good gasket ought to last three years. One of the plaintiff's witnesses testified "when the joints are not properly put together, and this leather was under the boat and being saturated with salt water, it would very soon rot and become useless. You might as well put a piece of that blotting paper in." On July 2d, when the yacht was in Cuban waters, the gasket gave out and let salt water into the condenser pipe, and this salt water, being pumped into the boiler, caused sections of the latter to burst. The vessel was put in a dry dock and these sections were taken out. It was found that the gasket was gone, and a new gasket was put in and the leaking ceased. As this leak was occasioned by the loss of the gasket, which had been in use only a few months, and which, if good, ought to have lasted several years, the presumption is that the leak occurred through a defect in the gasket, unless there is evidence to show that it occurred through perils of the sea or unavoidable accident. The evi-·

·dence is not sufficient to show that this was the fact, and the owner has not lifted the burden and proved that the leak occurred through a peril of the sea or unavoidable accident. He is therefore liable to make good the damages which the defendant sustained by reason of the defect, for such a defect rendered the vessel unseaworthy. This is true whether the defect was known or unknown. Work v. Leathers, supra.

The court properly charged that the charter party contained an implied covenant that the yacht was seaworthy, and submitted to the jury the question whether she was or was not seaworthy, instructing them that, if she was not, then the defendant was entitled to offset against the plaintiff's claim any damages resulting therefrom; and it is probable that the jury found unseaworthiness, inasmuch as a deduction was made from the plaintiff's claim, but it is not possible to say what effect resulted from a subsequent instruction.

The court charged that, "under all the circumstances of this case, this defendant was bound to restore her to as good condition as she was before, and the defendant is liable for whatever was the reasonable and necessary expense of doing it; since, confessedly, she was not returned in that condition." To this the defendant excepted, and requested the court to charge: "That the defendant is not liable for injuries from perils of the sea." This was refused, and the court charged "that the liability extends to every depreciation of her condition which might happen from any cause whatever while she was in his possession, except a destruction of her such that she could not be returned at all." To this the defendant excepted. I think that this charge was too broad. Even if the charter party was a demise of the yacht to the defendant—which it was not—it contained an implied warranty that she was seaworthy. If, then, the damages of the defendant resulted from her unseaworthiness, the owner was liable for breach of warranty, and there is ample evidence that damage and delay resulted from a defective gasket. Hence the instruction that the defendant's liability extended to every depreciation from any cause whatever, except her total destruction, was error; for the owner, and not the defendant, was responsible for injuries arising from unseaworthiness.

Defendant's counsel requested the court to charge that the defendant is not liable for any negligence or carelessness of the master or crew. After some discussion, the court said: "I will not charge it. I think the crew was yours and under your direction; whatever they did you had to make good." And to this the defendant excepted. The correctness of this charge depends upon the construction to be given to the charter party as to the ownership of the vessel during the life of the charter. Here we must remember the rule of law applicable to instruments of this character. In Raymond v. Tyson, 17 How. 53, ·59, 15 L. Ed. 47, it was said:

"It must be remembered that a charter party is an informal instrument as often as otherwise, having inaccurate clauses, and that on this account they must have a liberal construction, such as mercantile contracts usually receive, in furtherance of the real intention of the parties and usage of trade. So Lord Mansfield said a long time since. Abbott, in his treatise relative to merchant ships and seamen (Story's Edition, 188), gives the rule of construction

very much in the same words, but perhaps with more precision: 'The general rule which our courts of law have adopted in the construction of this as well as other mercantile instruments is that the construction should be liberal, agreeable to the real intention of the parties, and conformable to the usage of trade in general, and of the particular trade to which the contract relates.' Chancellor Kent, in his 47th chapter on the 'Contract of Affreightment,' cites the rule approvingly."

With this rule in mind, let us examine the contract. The owner chartered his vessel to the defendant for two months or longer, agreeing to pay "crew's wages, not to exceed $800 per month." That included master's wages. There is nothing to contradict the presumption that the owner appointed Capt. Gibson, the master, and all of the crew. It appears affirmatively that he appointed Neal and Willex, the engineers, in whose department was the defective gasket. The plaintiff's witness Neal testified that the yacht was in charge of Capt. Gibson, and this necessarily, so far as the navigation of the vessel was concerned. It is true that the persons sent aboard by the defendant as reporters directed the voyages of the vessel, but they certainly had no connection with the management and navigation of the vessel. This is more evident from the fact that the damage to the condenser and boiler resulted either from the vessel's unseaworthiness or her faulty navigation or the perils of the sea, not from the power of Bennett to direct her destination. Indeed, it was proved that on one occasion the master was directed to go to Guantanamo, and started, but, without orders from any of the defendant's agents, returned, and, when asked the reason, stated that the condenser was broken and he had only enough steam to get back to harbor.

Defendant did not have exclusive possession of the yacht within the authorities cited below. The words "deliver" and "return" are to be construed liberally, and not in a technical sense. They do not control the facts or the other parts of the charter party.

In Reed v. United States, 78 U. S. 591, 600, 601, 20 L. Ed. 220, Mr. Justice Clifford said:

"Affreightment contracts are of two kinds, and they differ from each other very widely in their nature, as well as in their terms and legal effect. Charterers or freighters may become the owners for the voyage without any sale or purchase of the ship, as in cases where they hire the ship and have by the terms of the contract, and assume in fact, the exclusive possession, command, and navigation of the vessel for the stipulated voyage. But where the general owner retains the possession, command, and navigation of the ship, and contracts for a specified voyage, as, for example, to carry a cargo from one port to another, the arrangement in contemplation of law is a mere affreightment sounding in contract, and not a demise of the vessel, and the charterer or freighter is not clothed with the character or legal responsibility of ownership. Unless the ship herself is let to hire, and the owner parts with the possession, command, and navigation of the same, the charterer or freighter is not to be regarded as the owner for the voyage, as the master, while the owner retains the possession, command, and navigation of the ship, is the agent of the general owner, and the mariners are regarded as in his employment, and he is responsible for their conduct. Courts of justice are not inclined to regard the contract as a demise of the ship if the end in view can conveniently be accomplished without the transfer of the vessel to the charterer; but where the vessel herself is demised or let to hire, and the general owner parts with the possession, command, and navigation of the ship, the hirer becomes the owner during the term of the contract, and if need be

he may appoint the master and ship the mariners, and he becomes responsible for their acts."

Mr. Justice Field, in Leary v. United States, 81 U. S. 607, 610, 611, 20 L. Ed. 756, said:

"There is no doubt that under some forms of a charter party the charterer becomes the owner of the vessel chartered for the voyage or service stipulated, and consequently becomes subject to the duties and responsibilities of ownership. Whether in any particular case such result follows must depend upon the terms of the charter party, considered in connection with the nature of the service rendered. The question as to the character in which the charterer is to be treated is, in all cases, one of construction. If the charter party let the entire vessel to the charterer, with a transfer to him of its command and possession and consequent control over its navigation, he will generally be considered as owner for the voyage or service stipulated. But, on the other hand, if the charter party let only the use of the vessel, the owner at the same time retaining its command and possession and control over its navigation, the charterer is regarded as a mere contractor for a designated service, and the duties and responsibilities of the owner are not changed. In the first case the charter party is a contract for the lease of the vessel; in the other it is a contract for a special service to be rendered by the owner of the vessel. In examining the adjudged cases on this subject we find some differences of opinion, especially in the earlier cases, as to the effect to be given to certain technical terms used in the charter party in determining whether the instrument parts with the entire possession and control of the vessel, but no difference as to the rule of law applicable when the construction is settled. All the cases agree that entire command and possession of the vessel, and consequent control over its navigation, must be surrendered to the charterer before he can be held as special owner for the voyage or other service mentioned. The retention by the general owner of such command, possession, and control is incompatible with the existence at the same time of such special ownership in the charterer."

It follows from these authorities that it was error to charge that the crew were the servants of the defendant and that he was liable for their acts.

For these reasons, I think the judgment and order should be reversed and a new trial granted.

Judgment and order reversed, and new trial granted, costs to abide the event. All concur; JENKS, J., in result.