FRANK PELOSO, Appellant, *v.* THE CITY OF NEW YORK, Respondent.
CONCETTA PISATURO, as Administratrix, etc., of PETER PISATURO, Deceased, Appellant, *v.* THE CITY OF NEW YORK, Respondent.

First Department, July 2, 1924.

**Ships and shipping — actions for injuries suffered and for death caused when dumping doors in garbage scow opened — defendant chartered scow, including services of captain and mate — defendant had absolute control of movements of scow — person injured and one killed were employees of contractor engaged to trim garbage — defendant's inspector supervised loading and dumping — accident was caused by worn out appliance — defendant was in effect owner of scow and in control — defendant is liable under Labor Law, § 200, now Employers' Liability Law, § 2, for failing to provide safe place to work.**

The defendant is liable for the injuries suffered by one employee and for the death of another employee of a contractor engaged to trim garbage on a scow, on the theory that it failed to furnish a safe place for the employees to work, as provided by section 200 of the Labor Law (now section 2 of the Employers' Liability Law), since it appears that the defendant chartered the scow, including the services of the captain and a mate, and had absolute control of its movements; that a city inspector supervised the loading and dumping of the garbage; that the dumping doors in the scow opened while the scow was at the dock and the two employees were thrown into the river; and that the accident was caused by the giving way of a worn out appliance which was used to hold the doors in position.

Since the scow was chartered to the defendant and was in its sole and exclusive possession and control, it stood in the position of owner and was under the obligation of furnishing a safe place to work for the employees of the contractor engaged to trim the garbage.

APPEAL in the first above-entitled action by the plaintiff, Frank Peloso, and in the second above-entitled action by the plaintiff, Concetta Pisaturo, as administratrix, from a judgment of the Supreme Court in favor of the defendant in each action, entered in the office of the clerk of the county of New York on the 20th day of March, 1924, upon the dismissal of the complaint in each action at the close of the plaintiff's case.

*Newmark & Miller* [*Henry S. Miller* of counsel], for the appellants.

*George P. Nicholson, Corporation Counsel* [*Elliot S. Benedict* of counsel]; *John F. O'Brien* and *Charles C. Marrin* with him on the brief], for the respondent.

MARTIN, J.:

The city chartered the scow *Eastman No. 3* from the owner, F. P. Eastman, on October 24, 1919. With the scow Eastman furnished a crew consisting of a captain and a mate. The city also engaged a contractor to furnish labor to trim garbage and assist in the shifting of the scow when necessary.

The relationship between the city and the contractor on the one hand, and the city and the scow owner on the other, is fully set forth in letters exchanged between the parties. Counsel stipulated that these letters constituted the agreement between the parties. In the letter of November 5, 1919, the city chartered several scows or dumpers, including the one in question, " from the time the vessels leave Mariners' Harbor, Staten Island, New York, until the time they are returned there by " the department of street cleaning, and agreed to pay therefor fifty dollars a day. The agreement was to continue from day to day until terminated. It was in force on May 21, 1920, the date of the accident. The city agreed to remove the vessel from Mariners' Harbor and to return it to that point at the termination of the agreement at its own cost and expense. It further agreed to return the vessel thoroughly cleansed and in as good condition as when received by it, reasonable wear and tear excepted. The bills for the hiring of the vessels were to be submitted weekly by Eastman. He agreed to supply each vessel with a crew and full equipment, the wages of the crew to be paid by him and included in the charter hire. The agreement with Eastman was the usual and ordinary contract for the charter of a vessel.

Early in January, 1920, by letters exchanged between the department of street cleaning of the city of New York and Joseph Marrone, the latter agreed to furnish the necessary labor for the trimming of the garbage and for the shifting of the scow. The agreement was to continue from week to week until terminated. It was terminated on September 20, 1920, but was in full force and effect on May 21, 1920, the date of the accident. The city agreed to pay Marrone forty dollars per week, and also agreed to give him the privilege of picking and reclaiming articles in the garbage and appropriating the same to his own use. It was expressly stipulated that Marrone's men would shift the vessel whenever necessary in the judgment of the city dump inspector.

The department of street cleaning of the city of New York, on the 21st day of May, 1920, the date of the accident, had an inspector supervise the loading and dumping of the garbage on *Eastman No. 3.*

Further light on the relationship of the parties and their respective

duties was given by the testimony of the captain of the scow and Marrone's laborers.

The city inspector supervised the loading and dumping of the garbage on the pier and on the scow. The garbage was brought to the dock by the trucks of the street cleaning department of the city of New York, and dumped from the trucks onto the scow by means of a runway. The scow had six boxes or compartments, three on each side.. When one side of the scow, the side contiguous to the dock, was loaded with garbage, the scow was shifted or turned about and the other side was then loaded. The plaintiffs and other laborers employed by Marrone were engaged in trimming the garbage on the scow, and also assisted in the shifting of the scow. Two boxes or compartments constituted one set. When the scow was fully loaded, it was taken to sea, and there the boxes were opened and the garbage dumped. While moored to the dock, the doors of the boxes were shut; they were opened only to release the garbage at sea. Each box had a two-fold door which was opened and shut by means of a chain contrivance. Each set of compartments had a separate set of chains. The chains were wound on a cogwheel located below. To shut the compartments the chains were wound on the wheel, and an iron rod or jack was then inserted between the cogs or teeth of the wheel, which held the chains and wheel in place and thereby kept the doors of the boxes shut. To open the doors and release the garbage, it was necessary to " knock out " this jack, thereby releasing the chains.

The men employed by Marrone had nothing whatever to do with the mechanism opening and closing the doors of the compartments. These were manipulated by the captain of the scow. Quite obviously the opening and closing took place only while at sea. When the captain left Mariners' Harbor at the time of the charter, he was instructed by Eastman to report to the city inspector at the One Hundred and Thirty-eighth street dump and thereafter to take his orders from the city inspector. Eastman merely paid the captain's wages; he had nothing to do with the operation of the scow and gave the captain no orders whatever with reference to managing the scow. All orders were received from the city inspector. During the continuance of the charter hire, the scow was never taken back to Eastman. The city inspector told the captain when to go to sea. The scow had no motive power of its own, but was taken to sea by tugboats which were ordered by the city inspector. The tugboats did not belong to Eastman. Upon his return from sea the captain reported to the city inspector; he communicated with Eastman only if the scow leaked or " broke."

First Department, July, 1924. [Vol. 210

The city inspector issued orders to Marrone's men for the loading of garbage and the shifting of the vessel. Prior to the occurrence of the accident the captain of the scow had wound the chains and shut the compartments. On May 21, 1920, Frank Peloso and Peter Pisaturo were on board the scow trimming garbage while the same was being loaded on the scow which was fastened to the pier. Each was standing in a box. Suddenly the doors of the boxes in which they were standing opened and they with a large amount of garbage were precipitated into the river. A rope was fastened about Peloso's leg and he was hauled out, sustaining injuries. Pisaturo was drowned.

About three weeks before the accident occurred it was observed by some of Marrone's men and also by the captain in charge of the scow that the chains of the particular compartments were worn and rusty; that the teeth of the cogwheel were worn and that the pole or jack used to hold the cogwheel in place was worn off and loose. No change whatever took place in the condition of the mechanism between that time and the occurrence of the accident. Immediately thereafter it was found that the jack was loose and out of place, and that the chain had unwound or slackened. It was also observed that the wood to which the cogwheel was fastened was worn and loose. In fact, the whole mechanism was very rusty and failed to work smoothly, so much so that on the trip to sea, which followed the accident, it was necessary to insert a wooden wedge in order to hold the jack or pole in place.

Plaintiffs assert that the defendant failed to furnish Peloso and Pisaturo a safe place to work, and that upon the evidence presented it is liable for the damages caused by reason of such failure.

In *Hess* v. *Bernheimer & Schwartz Brewing Co.* (219 N. Y. 415), referring to that part of section 200 of the Labor Law of 1909 (as amd. by Laws of 1910, chap. 352), which is now section 2 of the Employers' Liability Law of 1921, which provides that the making of a contract with an independent contractor to do part of an employer's work shall not bar the liability of the employer for injuries to the contractor's employees, the court said (at p. 418): " ' The duty of the owner to the employee of the contractor is the duty owed by an employer to his own employee in such a case.' [*Sullivan* v. *New Bedford Gas & Edison Light Co.*, 190 Mass. 288; *Crimmins* v. *Booth*, 202 Mass. 17; *Pettingill* v. *Porter & Son, Inc.*, 219 Mass. 347.] The duty at common law was, *inter alia*, to furnish a safe place to work. (*Coughtry* v. *Globe Woolen Co.*, 56 N. Y. 124.) This duty has been extended by statute (Labor Law, § 200, subd. 1) to include the tools and appliances without which the

place to work would be incomplete. 'A plant is defective when any part of it is not in a proper condition for the purpose for which it was intended and it is also defective when it is so incomplete that the use of the plant is dangerous by reason of the failure to furnish reasonably necessary parts for the purpose for which it is used.' (*Wiley* v. *Solvay Process Co.*, 215 N. Y. 591.) * * * If the employer furnishes a ladder or a scaffold for the contractor's employees to work on he must be careful to furnish a safe appliance. (*Huston* v. *Dobson*, 138 App. Div. 810; *Fuller* v. *Mulcahy & Gibson*, 164 App. Div. 829.) "

Where the exclusive possession and control of the "place" where the work is being performed is in the defendant, it is chargeable with the duty of inspection to ascertain whether or not the place is safe. (*Dangelo* v. *Danforth Co.*, 192 Fed. Rep. 678; *Blumquist* v. *Snare & Triest Co.*, 135 App. Div. 709; *Cline* v. *Northern Central R. R. Co.*, 181 id. 205; *Dziengelewsky* v. *Turner & Blanchard, Inc.*, 191 id. 341, 344; *Powell* v. *Cohoes Railway Co.*, 136 id. 204.)

Where the possession and control of the defendant is not exclusive or is temporary, as in the case of stevedores loading or unloading vessels, or ship repairers repairing a vessel (*Liverani* v. *Clark & Son*, 231 N. Y. 178; *Groonstad* v. *Robins Dry Dock & Repair Co.*, 201 App. Div. 581; *Dziengelewsky* v. *Turner & Blanchard, Inc.*, 191 id. 341, 344), the duty as to inspection is confined to those cases where there is some "condition to excite suspicion or to suggest defects or danger."

In *Dziengelewsky* v. *Turner & Blanchard, Inc.* (*supra*), the court said (at p. 344): "An employee cannot recover for an injury from such a defective place, where the place was not under the master's control, without showing that the employer had knowledge of the defect. (*Powell* v. *Cohoes Railway Co.*, 136 App. Div. 204 — a general principle specially applicable to shore laborers on a vessel; *Hughes* v. *Leonard*, 199 Penn. St. 123; *Moynihan* v. *King's Windsor Cement, etc., Co.*, 168 Mass. 450; *O'Malley* v. *N. Y., N. H. & H. R. R. Co.*, 210 id. 344.) "

In this case the scow was chartered to and in the sole possession and control of the defendant, which had full opportunity to inspect. It was, under the charter, owner *pro hac vice*, in control of the "place."

In *Leary* v. *United States* (14 Wall. 607; 20 L. ed. 756) the Supreme Court of the United States said: "There is no doubt that under some forms of a charter-party the charterer becomes the owner of the vessel chartered for the voyage or service stipulated, and consequently becomes subject to the duties and responsibilities of ownership. Whether in any particular case such result follows

must depend upon the terms of the charter-party considered in connection with the nature of the service rendered. The question as to the character in which the charterer is to be treated is, in all cases, one of construction. If the charter-party let the entire vessel to the charterer with a transfer to him of its command and possession and consequent control over its navigation, he will generally be considered as owner for the voyage or service stipulated."

In the case of a scow similarly in the possession and under the control of the respondent, not the owner, and which capsized, Judge HAZEL in *Dangelo* v. *Danforth Co.* (192 Fed. Rep. 681) said: " The duty of inspection to ascertain the condition of the scow as to fitness and seaworthiness devolved upon Danforth & Co. which was bound as a matter of law to furnish the deceased with a safe place in which to work. *Blumquist* v. *Snare & Triest Co.*, 135 App. Div. 709, 119 N. Y. Supp. 728."

This duty under the Labor Law to furnish a safe place to work was upon the defendant, though it was not the direct employer of Peloso and Pisaturo. (*Miller* v. *North Hudson Contracting Co.*, 166 App. Div. 348.)

We believe there was sufficient evidence to entitle the plaintiffs to submit to the jury the question whether the defendant, the city of New York, furnished Peloso and Pisaturo a safe place to work.

The judgments dismissing the complaints should be reversed, and a new trial ordered, with costs to the appellants to abide the event.

CLARKE, P. J., SMITH, MERRELL and FINCH, JJ., concur.

In each case: Judgment reversed and new trial ordered, with costs to appellant to abide the event.